UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

THE STOP & SHOP SUPERMARKET
COMPANY, GIANT OF MARYLAND, LLC
and AMERICAN SALES COMPANY, INC.,

                    Plaintiffs,

    v.

SMITHKLINE BEECHAM CORPORATION,

                    Defendant.

Docket No. 03-4578

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF A SETTLEMENT CLASS AND FOR PRELIMINARY APPROVAL OF SETTLEMENT

## I.    INTRODUCTION

Plaintiffs The Stop & Shop Supermarket Company, Giant of Maryland, LLC and American Sales Company, Inc., move this Honorable Court for the entry of an order certifying a class action for settlement purposes against SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") and preliminarily approving the proposed settlement between Plaintiffs, the Direct Purchaser Settlement Class and GSK, which settles the action for a cash payment of $100 million (the "Settlement Agreement").  Plaintiffs submit this memorandum of law in support of their Motion For Certification Of A Settlement Class And For Preliminary Approval Of Settlement.

## II.    BACKGROUND

### A.    Paxil® Antitrust Litigation

Plaintiffs claim that GSK unlawfully excluded competition in the market for Paxil® and its generic equivalents, paroxetine hydrochloride anhydrate and paroxetine hydrochloride hemihydrate. *Class Action Complaint*, ¶ 1. Paxil® is a selective serotonin reuptake inhibitor ("SSRI") anti-depressant drug manufactured by GSK, which has allegedly employed a long-standing scheme to use various illegal and deceptive means to improperly maintain a monopoly with respect to the market for paroxetine hydrochloride. *Id.* The direct purchasers in this action contend that GSK violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in the following unlawful acts, among others:  (1) conducting sham litigation against generic manufacturers, which sham litigation triggered a series of events including, or tied to, the automatic thirty-month regulatory stay to generic competition; (2) making intentional misrepresentations to the Patent and Trademark Office; and (3) making intentional misrepresentations to the Food & Drug Administration in order to make fraudulent listings for

publication in the Approved Drug Products With Therapeutic Equivalence Evaluations ("Orange Book"), which listings provide Defendant with the ability to wrongfully exclude competition by generic manufacturers. *Id.*

Moreover, Plaintiffs allege that as a result of those illegal acts, GSK has:

- unreasonably restrained, suppressed and eliminated competition in the market for paroxetine hydrochloride (Paxil® and generic versions of Paxil®);

- illegally maintained its monopoly in the market for paroxetine hydrochloride;

- fixed, raised, maintained and/or stabilized the price for Paxil® at supracompetitive levels; and

- overcharged Plaintiffs and other direct purchasers of Paxil® many millions of dollars by depriving them of the benefits of competition from lower-priced generic versions of paroxetine hydrochloride.

*Id.* at 2. As a result of those allegedly illegal acts, which are common to all Plaintiffs and Class members, GSK unlawfully possessed a monopoly in the United States market for paroxetine hydrochloride, and willfully and illegally maintained that monopoly in violation of Section 2 of the Sherman Act. *Id.* at ¶¶ 3-4, 110-120.

**B.     Summary of the Settlement Agreement**

The proposed Settlement Agreement provides for a cash payment of $100 million to the Plaintiffs and the Settlement Class in exchange for a full and complete settlement and release of all claims that the Plaintiffs have asserted or could have asserted in this Class Action. The Settlement Class is defined as:

> All persons or entities in the United States or its territories who purchased Paxil® directly from SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline at any time during the period of December 29, 1997 through September 30, 2004. Excluded from the class are SmithKline, and its employees, subsidiaries and affiliates, and all government entities. Also excluded from the Class are claims held by, either directly or through assignment, CVS Meridian, Inc., Rite

Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc.

The companies that are excluded from the Settlement Class in the last sentence of the definition have been represented on an individual basis by separate counsel and have reached a separate settlement with GSK, which is similar to the agreement reached on behalf of the Class. Declaration of Jeffery Kodroff, submitted herewith, ¶ 2.

## III.   THE DIRECT PURCHASER SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR CERTIFICATION OF A SETTLEMENT CLASS

### A.   Class Certification is Favored in Antitrust Cases

The Supreme Court has long recognized that class actions play an important role in the private enforcement of the antitrust statutes. The treble damages remedy under federal antitrust law is designed to encourage potential litigants to effectively serve as "private attorney general" in promoting enforcement of the antitrust laws. *See Hawaii v. Standard Oil Co.,* 405 U.S. 251, 266 (1972). Rule 23 class actions "enhanc[e] the efficacy of these private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *Id.*

In antitrust cases, courts resolve doubts about class certification in favor of certifying a class action. *See, e.g., DeLoach v. Phillip Morris Cos. Inc.,* 206 F.R.D. 551, 554 (M.D.N.C. 2002) (class action tool is an important device in enforcing the antitrust laws); *In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 378 (S.D.N.Y. 1996) (because of the important role class actions play in antitrust enforcement, doubts should be resolved in favor of class action). Federal courts find this type of pharmaceutical class action particularly well suited for class action treatment and routinely certify similar, if not identical, classes to the one proposed in this action. *See, e.g., In re Relafen Antitrust Litig.,* 218 F.R.D. 337 (D. Mass. 2003); *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508 (E.D. Mich. 2003); *In re Buspirone Patent Litig.,* 210 F.R.D.

- 4 -

43 (S.D.N.Y. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001).

**B.      The Settlement Class Meets the Requirements for Certification Pursuant to Fed. R. Civ. P. 23**

In *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court established that a settlement class must satisfy the requirements of Fed. R. Civ. P. 23.  The Court stated: "Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." *Id.* at 621.  *See also In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) ("a district court must first find a class satisfies the requirements of Rule 23, regardless whether it certifies the class for trial or for settlement").  The Supreme Court, however, has explained that a district court need not address manageability questions in deciding whether to certify a settlement class.  The Court stated: "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

1.      **The Requirements of Rule 23(a) Are Satisfied**

a.      **The numerosity requirement is satisfied**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *See Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir.) ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed. R. Civ. P. 23(a)(1)."); *Duffy v. Massinari*, 202 F.R.D. 437, 442 (E.D. Pa. 2001) ("The prospective class

satisfies the numerosity requirement.  The prospective class involves approximately 129

individuals in Baltimore, Maryland, and six other locations nationwide.  The size and

geographical dispersion of the proposed class makes joinder impracticable, thus meeting the

numerosity requirement.").  Here, the class consists of approximately 90 direct purchasers of

Paxil®.  Moreover, it would be impracticable to join the putative class members as parties,

because they are scattered throughout the United States.  This establishes numerosity.

**b.      Questions of law and fact are common to all Class members**

The commonality requirement is easily established in this case.  In *In re Prudential Ins.*

*Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir. 1998), the Third Circuit stated:

> A finding of commonality does not require that all class members
> share identical claims, and indeed 'factual differences among the
> claims of the putative class members do not defeat certification.'
> *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (citing
> *Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)).  'The
> commonality requirement will be satisfied if the named plaintiffs
> share at least one question of fact or law with the grievances of the
> prospective class.'  *Id.*

(Footnote omitted.)  In this case, numerous questions of fact or law are common to the Class

members, including *inter alia*:

- the definition of the relevant market for analyzing GSK's monopoly power;

- whether GSK had monopoly power in the relevant market;

- whether GSK illegally maintained such monopoly power;

- whether GSK's activities substantially affected interstate commerce; and

- whether, and to what extent, GSK's conduct caused antitrust injury to the business
  or property of Plaintiffs and the Class members.

Those common questions establish commonality.  *See Relafen*, 218 F.R.D. at 342 (in

certifying class, court found that common factual questions included "whether SmithKline

- 6 -

engaged in the alleged anticompetitive conduct and whether and to what extent this conduct

resulted in overcharges" and common legal issues included "whether SmithKline's conduct

violated Section 2 of the Sherman Act"); *Buspirone*, 210 F.R.D. at 57 ("There are also numerous

common questions of fact and law at issue among the members of the proposed class concerning

whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and

whether this conduct resulted in any overcharges in the market for buspirone.").

c.   **Plaintiffs' claims are typical of the claims of the Class**

Typicality is readily established in this case.  In *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d

Cir. 1994), the Third Circuit stated:  "Cases challenging the same unlawful conduct [affecting]

both the named plaintiffs and the putative class usually satisfy the typicality requirement."  The

Third Circuit also explained that "'[f]actual differences will not render a claim atypical if the

claim arises from the same event or practice or course of conduct that gives rise to the claims of

the class members, and if it is based on the same legal theory.'"  *Id.* (citation omitted).  Further,

"even relatively pronounced factual differences will generally not preclude a finding of typicality

where there is a strong similarity of legal theories."  *Id.*

The claims of Plaintiffs and all Settlement Class members arise out of a core pattern of

alleged anti-competitive conduct by GSK that, if true, similarly injured each of them by

artificially raising or stabilizing the price of Paxil®.  The delay in generic competition blocked

*all* Class members from purchasing Paxil® at a lower price.  Thus, there can be little question

that the typicality requirement is satisfied.  Numerous courts have found typicality to exist in

certifying class actions against drug companies under the Sherman Act.  *See Relafen*, 218 F.R.D.

at 343 ("Louisiana Wholesale, lead direct purchaser plaintiff, bases its claims on the same 'core

pattern of alleged anti-competitive conduct' that gives rise to all class members' claims....

- 7 -

Accordingly, the claims of Louisiana Wholesale are typical of those asserted by other members of the class."); *Lorazepam*, 202 F.R.D. at 27 ("[T]he Court agrees with the plaintiffs that their theories of monopolization, conspiracy to monopolize, and price fixing will be the same for all proposed class members. The claims all stem from the defendants' unlawful price-fixing and monopolization of the supply of APIs and its consequences in the lorazepam and clorazepate markets."). *See also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) ("Here, as in other antitrust cases, the claims of the named representatives and the claims of the class members arise from the same events; they claim injury from the same HRMI/Andrx Agreement that this Court has found to be a *per se* violation of section 1 of the Sherman Antitrust Act. Their claims are typical of the class claims because each is a direct purchaser, or assignee of a direct purchaser, of Cardizem CD, and each claims that they were forced to pay an artificially inflated price for their purchases as a result of Defendants' illegal conduct."). For the same reasons, the typicality requirement is satisfied in this case.

> d.    **Plaintiffs and Class Counsel have adequately represented the Class**

The Third Circuit has explained that the "final Rule 23(a) prerequisite encompasses two distinct inquiries designed to protect the interests of absentee class members. First, the adequacy of representation inquiry 'tests the qualifications of the counsel to represent the class.' *G.M. Trucks*, 55 F.3d at 800. Second, it 'serves to uncover conflicts of interest between named parties and the class they seek to represent.' *Amchem*, 117 S. Ct. at 2250." *Prudential*, 148 F.3d at 312.

> (1)    **The Plaintiffs' interests are not in conflict with Class interests**

No conflict exists among the Class members, all of whom seek recompense for increased prices they paid for Paxil® as a result of SmithKline's wrongful conduct. By pursuing this litigation on behalf of the Class members, Plaintiffs will advance the common interests of the

Class.  As this Court stated in another context, "I conclude that any potential conflict is too remote and speculative to warrant withholding class certification at this time.  *See* 1 Herbert B. Newberg et al., Newberg on Class Actions § 3.25 at 3-135-36 & n. 357 (3d ed. 1992) (and cases cited therein) ('Conflict challenges relating to the class claims may represent . . . speculative conflicts that may never materialize. Many courts have held that speculative conflict should be disregarded at the class certification stage.')."  *Rosen v. Fidelity Fixed Income Trust*, 169 F.R.D. 295, 300 (E.D. Pa. 1995).  *See also Relafen*, 218 F.R.D. at 343 ("Louisiana Wholesale asserts claims typical of those of the class, claiming similar injuries, suffered during the same period and arising from the same conduct. As such, the Court concluded that no conflicts presently exist."); *Lorazepam*, 202 F.R.D. at 28 ("Having already rejected the defendants' standing objections, and finding that the same theories of liability will be advanced by both the class representatives and the putative class members, the Court concludes that the plaintiffs' have met their burden for typicality.").

(2)    **Class Counsel have capably represented the Class**

Plaintiffs are represented by lead counsel Thomas Sobol of Hagens Berman LLP and Jeffrey Kodroff of Spector Roseman & Kodroff, P.C.  Both attorneys are experienced class-action counsel.  *See Duffy*, 202 F.R.D. at 443 ("there is no indication that counsel lacks the skill or experience to undertake the litigation, and the Court is satisfied that counsel will competently, responsibly, and vigorously prosecute the suit").

2.    **The Requirements of Rule 23(b)(3) are met in the Settlement Context**

Plaintiffs satisfy the requirements of Rule 23(b)(3), which provides that a class may be certified if the requirements of Rule 23(a) are met and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." For the reasons set forth below, common issues predominate in this case, and a class action would be the superior means of litigation.

      a.    **The Questions of Law and Fact that are Common to the Class Predominate Over Any Individual Issues**

In *Amchem*, 521 U.S. at 625, the Supreme Court stated: "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Similarly, one court has stated: "It is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998) (citing cases). Another court has stated:

> [L]ong ago the Supreme Court recognized the importance that class actions play in the private enforcement of antitrust actions, stating that Rule 23 "enhances the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266, 31 L. Ed. 2d 184, 92 S. Ct. 885 (1972). Accordingly, courts have repeatedly found antitrust claims to be particularly well suited for class actions....

*Lorazepam*, 202 F.R.D. at 21.

Here, common issues of liability predominate over any individual issues. Similarly, Plaintiffs will present common proof of antitrust impact, as discussed in detail in Plaintiffs' *Brief in Support of Motion for Class Certification*, which was filed before the parties entered into the Settlement Agreement. The declarations of Charles King III, which Plaintiffs proffered in support of their class certification papers, demonstrate that antitrust impact can be demonstrated on a class wide basis. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 155 (3d Cir. 2002) ("[W]e conclude that the district court did not err in determining that plaintiffs showed that they

could establish injury on a class-wide basis. Plaintiffs produced affidavits of expert witnesses, Dr. Beyer and Dr. Cantor, who effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur such damages. We decide that this was not a case where plaintiffs relied solely on presumed impact and damages."). Moreover, individual damage issues provide no basis for denying certification when common issues otherwise predominate.  In *Bogosian*, the Third Circuit stated that "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." 561 F.2d at 456.  *See Rosen v. Fidelity Fixed Income Trust*, 169 F.R.D. 295, 301 (E.D. Pa. 1995) ("The individual questions that may be raised by this litigation, such as knowledge and damages, do not predominate over the central issue in the case, namely, whether the registration statements contained material misstatements or omissions.").  Courts that have dealt with monopolization claims alleging the prevention of generic entry have uniformly found that common issues predominate over individualized ones.  *See, e.g., Relafen*, 218 F.R.D. at 343-44; *Buspirone*, 210 F.R.D. at 57; *Lorazepam*, 202 F.R.D. at 27; *Cardizem*, 200 F.R.D. at 307-325.

       **b.**      **Class Treatment of this Matter is the Best Method to Achieve Judicial Efficiency and Ensure that All Plaintiffs Have the Opportunity to Assert their Claims**

In *Amchem*, 521 U.S. at 615, the Supreme Court stated that the requirement of superiority in Rule 23(b)(3), like that of predominance, ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote…uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Courts frequently certify antitrust class actions, recognizing that these actions are well

- 11 -

suited for common treatment and that the private enforcement purpose of antitrust laws is advanced by class actions.

This case satisfies the "superiority" requirement of Rule 23. Settlement of this case as a class action will achieve judicial efficiency and economy for both the Court and the litigants. Conversely, if certification were denied and parties litigated the issues in individual suits, all Class members would be faced with proving identical issues pertaining to GSK's violation of Section 2 of the Sherman Act. Each Class member would need to introduce the same evidence and make the same arguments to prove the violation. Therefore, the proof of an antitrust violation is common to all Class members. *See Lorazepam*, 202 F.R.D. at 29 ("the alleged violations of the antitrust laws at issue here respecting price fixing and monopolization relate 'solely to Defendants' conduct, and as such proof for these issues will not vary among class members'") (citation omitted).

Class certification would limit the likelihood of inconsistent rulings. "Resolution by class action would instead promote uniform treatment of class members – similarly situated direct purchasers who allege similar injuries resulting from the same conduct." *Relafen*, 218 F.R.D. at 347. Further, if class certification is denied, many class members may not have the opportunity to pursue their claims. While some class members are large purchasers, many of the members are small entities without the financial ability to litigate an individual action against GSK.

Settlement on a class basis is superior to individual litigation because settlement provides class members with prompt resolution and compensation for their injuries. Conversely, litigation is highly uncertain and those class members able to litigate individual claims may not receive compensation, if at all, before a trial and appellate proceedings are completed. Finally, as the

- 12 -

Supreme Court explained in *Amchem*, manageability is not at issue when a class is certified for settlement purposes.

### 3.   Proposed Class Counsel Meet the Requirements for Appointment under Rule 23(g)

Under Rule 23(g), a court that certifies a class must appoint class counsel.  Class counsel is charged with fairly and adequately representing the interests of the class.  Fed. R. Civ. P. 23(g)(1)(A)-(B).  In appointing class counsel, the Court must consider:  1) the work counsel has done in identifying or investigating potential claims; 2) counsel's experience in handling class actions, other complex litigation, and similar claims; 3) counsel's knowledge of the applicable law; and 4) the resources counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(C)(i).  The Court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.  Fed R. Civ. P. 23(g)(1)(C)(ii).

Plaintiffs seek the appointment of Thomas M. Sobol of Hagens Berman LLP and Jeffrey L. Kodroff of Spector, Roseman & Kodroff, as Co-Lead Class Counsel in this litigation.  As evidenced by the firm resumes attached to the motion as Exhibit F, Mr. Sobol and Mr. Kodroff have substantial experience in handling class actions and complex litigation, including antitrust litigation; are knowledgeable about antitrust law and class action practice; have demonstrated a commitment to prosecuting the case through the work they have done to identify and investigate the claims and a commitment to handling the case to date; and have committed and will commit the necessary resources to making sure that plaintiffs are well-represented in this litigation.

## IV.   THE COURT SHOULD GRANT PRELIMINARY
## APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT

Rule 23(e)(1) of the Federal Rules of Civil Procedure provides:

A. The court must approve any settlement, voluntary dismissal, or compromises of the claims, issues or defenses of a certified class.

B. The court must direct notice to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.

C. The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

Approval of class action settlements involves a two-step process. First, the court considers whether to approve the settlement preliminarily for purposes of communicating the terms of the settlement to the proposed class. *Manual for Complex Litigation (Third)* § 30.41 at 236-37 (1995). Second, after notice and an opportunity for each class member to object to the proposed settlement (or otherwise be heard) have been provided, the court will determine whether the settlement is fair, reasonable, and adequate and whether the settlement should be finally approved under Fed. R. Civ. P. 23(e). *Id.* at 237-38.

Accordingly, in considering whether to grant preliminary approval, the Court is not required to make a final determination on the adequacy of the Settlement or to probe extensively into the merits of the Settlement. Both of these inquiries are reserved for the final approval stage of the class settlement approval process. Class members' substantive rights will not be prejudiced by preliminary approval, since the proposed preliminary approval is solely to obtain authority to notify the Class of the terms of the Settlement and to set the stage for the final approval of the Settlement. *See Armstrong v. Board of School Directors,* 616 F.2d 305, 314 (7th Cir. 1980); *Berry v. School Dist.,* 184 F.R.D. 93, 97 (W.D. Mich. 1998); *Alaniz v. California*

*Processors, Inc.,* 73 F.R.D. 269, 273 (N.D. Cal. 1976); 4 *Newberg on Class Action* § 1.25 (4th Ed. 2002). "If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies…and [the settlement] appears to fall within the range of possible approval, the court should direct that notice" issue and should schedule a final approval hearing. *Manual,* § 30.41. Courts generally employ a multi-pronged test to determine whether a proposed settlement should be preliminarily approved. As articulated by the Third Circuit in *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liability Litig.,* 55 F.3d 768, 785 (3rd Cir. 1995), a court will approve a class action settlement *preliminarily* if it appears capable of possible approval and the court finds that (1) the negotiations leading to the proposed settlement occurred at arm's length; (2) there was sufficient discovery in the litigation for the plaintiff to make an informed judgment on the merits of the claims; (3) the proponents of the settlement are experienced in similar litigation and (4) only a small fraction of the class objects.

The Proposed Settlement Agreement in this action satisfies these requirements.

### 1.   The Proposed Settlement is the Product of Good Faith, Arm's-Length Negotiations

The proposed settlement resulted from extensive arm's-length negotiations undertaken in good faith between Lead Counsel and GSK. The settlement negotiation spanned numerous weeks, during which time the parties scrutinized the strengths and weaknesses of the pending claims, including consideration of, among other issues, liability, causation, and damages. The parties engaged in intensive bargaining over the merits and the value of Plaintiffs' claims, and the merits of GSK's defenses. Because of the extensive, arm's-length bargaining involved, there is no issue (or even a suggestion) of any collusive aspect to the proposed settlement.

2.    **The Posture of the Case, including the Status of Discovery, and Investigation by Class Counsel Support Preliminary Approval**

Discovery in this case spanned several months and has been extensive. Plaintiffs performed class discovery, including the preparation of expert reports, taking depositions and preparing numerous legal memoranda. Plaintiffs also began to analyze and synthesize hundreds of thousands of pages of documents and data obtained from GSK and various non-parties, including generic manufacturers and large wholesalers. At the same time, Plaintiffs answered extensive interrogatories and collected and produced records and documents. As a result of this effort, the facts concerning GSK's potential liability are extremely well developed. Counsel for the Plaintiffs also retained and worked with experts in evaluating scientific and economic issues relating to liability and damages. As a result, issues relating to liability and damages have been well developed by counsel for the Direct Purchaser Settlement Class to make an informed decision regarding the Settlement Agreement.

3.    **Proposed Class Counsel are Experienced and Highly Qualified in Antitrust Litigation**

The Class is represented by lawyers who have extensive class action experience. Co-Lead Counsel are on the forefront of antitrust litigation and complex litigation, as well as litigation pertaining to the pharmaceutical industry specifically. Thus, counsel are knowledgeable in both prosecution and settlement of this type of litigation. Accordingly, counsel's recommendations are entitled to great weight. Courts routinely afford great weight to the judgment of experienced counsel who have conducted arm's-length negotiations in approving proposed class settlements. *See, e.g., Fisher Brothers v. Phelps Dodge Industries Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("the professional judgment of counsel involved in the litigation is entitled to significant weight"); *Blank v. Talley Industries, Inc.*, 64 F.R.D. 125, 132

- 16 -

(S.D.N.Y. 1974) (a factor "entitled to substantial weight is that the settlement bears the imprimatur of seasoned and experienced counsel"); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F. Supp. 659, 667 (D. Minn. 1974) ("[t]he recommendation of experienced antitrust counsel is entitled to great weight"). The presumption in favor of such settlements reflects courts' understanding that vigorous, skilled negotiation protects against collusion and advances the fairness interests of Rule 23(e).

**B.    The Settlement Is Fair And Adequate**

For the adequacy determination at the final hearing, the Court will consider the strength of Plaintiffs' case, the time and expense involved in continued litigation, the solvency of Defendant, and whether there is any opposition to the settlement, among other factors. When balanced against the risk inherent in this litigation and the cost of going forward, these factors combined with the amount of the settlement strongly support a preliminary finding of adequacy. *See Strang v. JHM Mortg. Sec. Ltd. Part.,* 890 F. Supp. 499, 502 (E.D. Va. 1995) ("By Plaintiffs' own admission, the strength of their case is severely undermined by the difficulty of proving liability at trial. In addition to the difficulties of prevailing at trial, the substantial expense Plaintiffs would face in proceeding with this case favors settlement at this time."); *South Carolina Nat'l Bank v. Stone,* 749 F. Supp. 1419, 1426-27 (D.S.C. 1990) (complexity, expense and risks of litigation favor approval of settlement).

The $100 million cash proposed settlement is fair in light of the circumstances of this litigation. The proposed settlement provides a cash payment of $100 million for distribution to class members, after deduction of court-approved fees, expenses (including costs of notice and settlement administration) and any court-approved awards to the three plaintiff class representatives for prosecuting the litigation on behalf of the Class. Plaintiffs intend to file a

motion for an award of attorney's fees not to exceed 33-1/3% of the settlement fund and for reimbursement of expenses. Plaintiffs will also request that the Court approve an award of $15,000 to each of the three class representatives for their efforts in prosecuting this litigation on behalf of the class. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 364, 400 (D.D.C. 2001) ("courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.") (citations and internal quotations marks omitted). The net settlement fund will be distributed to class members based on their purchases of Paxil® from GSK during the Class Period.

The settlement amount of $100 million excludes claims by eight entities that have excluded themselves from this class action either directly or by assignment, i.e., CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc. Kodroff Decl., ¶ 2. Those entities, who are represented individually by separate counsel, have reached a separate settlement with GSK. *Id.* They have established that they have accounted for slightly more than one-third of the purchases of Paxil by direct purchasers during the Class period. *Id.* Their counsel have informed Co-Lead Counsel that their settlement is consistent with the $100 million Class Settlement. *Id.*

The settlement eliminates the risks involved in litigating this complex matter. GSK's attorneys have demonstrated that they will zealously present a strong case. Therefore, there is a substantial risk that Plaintiffs would not prevail in this action, which supports settlement. *See, e.g., In re First Databank Antitrust Litig.*, 205 F.R.D. 408, 411 (D.D.C. 2002) (noting inherent uncertainty of antitrust litigation in preliminarily approving settlement). Unlike many civil antitrust cases, here there has been no prior determination of criminal or civil liability. To

recover at trial, Plaintiffs will have to prove that GSK knowingly and fraudulently pursued patents on Paxil®, enforced or sought to enforce those patents knowing that they were obtained by fraud and that GSK's actions artificially raised the price of Paxil®, all against a vigorous and well-funded defense.

Plaintiffs and Co-Lead Counsel recognize that there are extreme risks in taking this case to trial.  This case is based on more than 20 underlying patent infringement suits that GSK brought against more than nine generic manufacturers for the alleged infringement of all of GSK's numerous Paxil® patents.  The primary Paxil patent at issue is the '723 patent.  Plaintiffs allege that GSK waged sham patent infringement litigation over the '723 patent and that the '723 patent was procured by Beecham by fraud on the United States Patent and Trademark Office ("PTO").

Plaintiffs' claim of sham litigation faces potentially insurmountable barriers.  As the Federal Circuit has explained, "in order to prove that a suit was within *Noerr*'s 'sham' exception to immunity, an antitrust plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068, 1072 (Fed. Cir. 1998). *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993).  Rulings by district court judges in the litigation over the '723 patent make it extremely difficult for Plaintiffs to meet their burden of proof.  After a full trial on the merits between GSK and Apotex, Judge Posner ultimately ruled that GSK's '723 patent was not infringed. *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011 (N.D. Ill. 2003), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004).  However, Judge Posner later specifically ruled in another lawsuit that GSK's litigation conduct against Apotex concerning the '723 patent

- 19 -

did not constitute sham litigation because GSK's position was not objectively baseless.  In assessing a sham litigation claim, Judge Posner stated that the plaintiff "cannot pass an objective test. Although I did rule that Apotex had not infringed patent 723, I made clear that the issue was a close one." *Asahi Glass Co. v. Pentech Pharm., Inc.*, 2003 U.S. Dist. LEXIS 19370, *18 (N.D. Ill. Oct. 30, 2003).

Plaintiffs in this action also must overcome Judge Kocoras's order (entered before Judge Posner was assigned the case for trial) granting GSK's motion for summary judgment on the issue of invalidity of the '723 patent under 35 U.S.C. § 102(b), (f), and (g). *SmithKline Beecham v. Apotex*, 286 F. Supp. 2d 925 (N.D. Ill. 2001).  Judge Kocoras found that there was no public use of Paxil prior to issuing of the patent. He reasoned that clinical trials for hemihydrate constituted experimental use and thus negated public use.  Given Judge Kocoras's ruling in favor of GSK, Plaintiffs will have a difficult time establishing that GSK's position on that issue was objectively baseless.  Thus, while the Federal Circuit ultimately ruled that the public use bar of 35 U.S.C. § 102(b) rendered claim 1 of the '723 patent invalid, there are extremely high barriers that Plaintiffs must surmount to demonstrate that GSK's litigation regarding the '723 patent was sham.

Plaintiffs' claim for fraud on the PTO faces similar problems.  The Federal Circuit has explained that antitrust liability may be imposed if it can be shown that "the asserted patent was obtained through knowing and willful fraud." *Nobelpharma*, 141 F.3d at 1068.  Thus, Plaintiffs must show intentional misrepresentation or omission of a material fact that was reasonably relied upon by the PTO.  Plaintiffs allege that GSK defrauded the PTO by, among other things, failing to disclose public use of paroxetine hydrochloride in Clinical Trials in the United States. Plaintiffs claim that GSK knew that clinical trials did not distinguish between anhydrate and

- 20 -

hemihydrate forms of Paxil® and yet obtained further patents for Paxil®. While Plaintiffs have evidence to support the claim that the '723 patent was procured by fraud, there are still significant challenges in defending that claim, given the high standard of proof that they face. As the Federal Circuit has explained, "a finding of *Walker Process* fraud may not be based upon an equitable balancing of lesser degrees of materiality and intent. Rather, it must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission." *Id.* at 1071. Thus, there is a great risk that Plaintiffs and the Class will recover nothing if this case proceeds.[1]

Settlement in this case also eliminates the financial burden that would be involved in litigating this case to trial. Antitrust litigation is complex and expensive. Among other things, discovery would be costly, as the parties expect to take numerous lengthy depositions in addition to ongoing document discovery. The organizational costs of managing such a large amount of discovery are considerable as well. The parties would have to bear the costs of multiple experts – professionals such as economists, patent experts, organic chemists, Food and Drug Administration experts – throughout discovery and trial. A cost-benefit analysis comparing the resources that would be spent bringing this case to trial with the certainty provided by a substantial settlement weighs heavily in favor of the settlement.

Settlement of this action for $100 million merits preliminary approval. Plaintiffs' expert estimates that damages for *all* direct purchasers, including the eight opt-out entities, would total approximately $1.78 billion, assuming generic entry in early 2001. (As noted above, however, GSK disputes that generic entry would have occurred at that time and contends that it would

---

[1] Moreover, there are substantial questions as to whether and when generic products would have entered the marketplace but for GSK's allegedly wrongful conduct. If generics could not have entered the marketplace in any event, Plaintiffs and the Class would not have suffered damages.

have occurred much later.)  That damage figure does not account for the phenomenon of generic

bypass, which could reduce the damage figure by twenty percent or more.  Kodroff Decl., ¶ 3.

Assuming the reduction is twenty percent, potential best-case damages would be reduced to

approximately $1.4 billion.  Further, the eight opt-out entities account for slightly more than one-

third of all purchases, so that the damage figure for the Settlement Class would equal

approximately $880 million.  Thus, the settlement of $100 million is approximately 11.4% of

potential damages.  *See* Ex. 1 to Kodroff Declaration.  As Judge DuBois recently noted, courts

have granted final approval to many settlements in the range of ten percent of potential damages

where substantial risks exist.  *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS

10532, *15-17 (E.D. Pa. June 2, 2004).[2]  Moreover, the settlement is in line with other recent

settlements against pharmaceutical companies in Sherman Act cases.  For example, (1) in the

Cardizem settlement the direct class members recovered approximately 15% of the total class

period expenditures, (2) in the BuSpar settlement the direct class members recovered

approximately 6% of the total class period expenditures, (3) in the Lorazapam and Clorazepate

settlements the direct class members recovered approximately 6% of the total class period

expenditures, (4) in the Taxol settlement the direct class members recovered approximately 2%

---

[2] The Court cited the following cases: "*Lazy Oil Co v. Witco*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (court approved settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the of the damages falling within the limitations period); *In re Anthracite Coal Antitrust Litigation*, 79 F.R.D. 707, 714 (M.D. Pa. 1978) (approving settlement of 28 percent of estimated damages for four years); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) (court approved a combined settlement of approximately 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94-404 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); *Fox v. Integra Financial Corp.*, Civil Action No. 90-1504 (W.D. Pa. July 9, 1996) (settlement of $6.5 million approved where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.*, 58 F.R.D. 19, 36-37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB*, Fed. Sec. L. Rep. (CCH) P 95,324 at 96,559, 1990 WL 73423 at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens v. Wotemco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise"), *aff'd* 899 F.2d 21 (11th Cir. 1990)." *Linerboard*, 2004 U.S. Dist. LEXIS 10532, at *15-17.

of the total class period expenditures, and (5) in the Relafen settlement the direct class members recovered approximately 7% of the total class period expenditures. Given the substantial barriers to success set forth above, the settlement merits preliminary approval.

## V.   THE COURT SHOULD APPROVE THE PROPOSED FORM AND MANNER OF NOTICE AND PROPOSED SCHEDULE LEADING TO A FAIRNESS HEARING

Rule 23(e)(1)(B) provides that the "court must direct notice in a reasonable manner to all class members who will be bound by a proposed settlement…." The purpose of the notice is to "afford members of the class due process which, in the context of Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment." *Peters v. National Railroad Passenger Corp.,* 966 F.2d 1483, 1486 (D.C. Cir. 1992) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-74 (1974)). *See Gottlieb v. Wiles,* 11 F.3d 1004, 1012-13 (10th Cir. 1993) (notice must fairly inform class members of the settlement and their options). The proposed notice program clearly meets this standard.

### A.   Plaintiffs Propose Three Forms of Notice

Plaintiffs propose three forms of Notice. Plaintiffs propose mailing the written notice by first class mail to each person or entity that purchased Paxil® directly from GSK at any time during the class period, at its last known address. See Exhibit C. Because GSK will be able to provide Plaintiffs with names and addresses of all class members, Plaintiffs anticipate no problem in reaching the class members directly by mail. Second, a summary notice will be published in *The Pink Sheet,* a trade publication of wide circulation. See Exhibit D. Finally, notice will be posted on the co-lead counsel's websites (www.hagens-berman.com and www.srk-law.com) and on a website especially created for the settlement (www.paxilsettlement.com).

**B.    Class Members will Receive Adequate Notice of the Settlement**

The form and manner of notice Plaintiffs propose will satisfy both the notice requirements of Rule 23(e) and due process requirements that must be met in order to bind each member of the Class. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950); *Twigg v. Sears Roebuck & Co.,* 13 F.3d 1222, 1226 (11th Cir. 1998).

The contents of the notices satisfy the requirements of Rule 23(e).  The proposed notices provide a description of the Class, the procedural status of the litigation, and a summary of the plan of allocation.  The notices also advise Class members of their rights under Rule 23(b)(3), including the right to be heard as to the reasonableness and fairness of the Settlement.  The notices also set forth the significant terms of the Settlement and the amount of money GSK has agreed to pay to the Direct Purchaser Class.  Finally, the notices outline the process by which the Court approves the proposed settlement, counsels' request for fees and reimbursement of expenses, and the proposed incentive award for Plaintiffs.

The notices fairly describe the proposed settlement and its legal significance as well as that of the class action, thereby satisfying the notice requirements of Rule 23(e).  *See, e.g., Twigg,* 153 F.3d at 1227 ("'[The notice] must also contain an adequate description of the proceedings written in objective, neutral terms, that, in so far as possible, may be understood by the average absentee class member.'") (*quoting In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088 (5th Cir. 1977); *Bennett v. Behring Corp.,* 96 F.R.D. 343, 353 (S.D. Fla. 1982) ("It is not the function of the settlement notice to fully inform the class of all the details of the settlement, but merely to put class members on notice of the general parameters of the settlement and to inform them of where information as to specifics may be obtained."), *aff'd,* 737 F.2d 982 (11th Cir. 1984).

- 24 -

C.      **Plan of Distribution**

GSK has agreed to make a payment of $100 million into an Escrow Fund within five business days after the filing of this motion for settlement approval. An Escrow Account has been established with Merrill Lynch, Pierce, Fenner & Smith Incorporated. That $100,000,000 payment constitutes the Direct Purchaser Class Settlement Fund. From that Fund will be taken any Court-awarded counsel fees, expenses, incentive awards to the three plaintiff class representatives, and the costs of notice and settlement administration. The remaining amount is the Net Settlement Fund.

Class members will be required to file claims using a Court-approved claim form. A Court-approved Claims Administrator will process all claims and recommend which claims are appropriate for payment and which claims, if any, should be recommended for disallowance. The net settlement fund will then be divided pro rata among all class members whose claims are approved. The Settlement Fund will be reduced if any class member excludes itself from the settlement. The amount of the reduction will be pro rata based on that class member's share of the Settlement Class's Paxil® purchases, as reflected in GSK's records.

## VI.      FINAL FAIRNESS HEARING

Plaintiffs respectfully request that the Court schedule a final fairness hearing to consider whether the settlement should be granted final approval. Fed. R. Civ. P. 23(e). *See also* Manual for Complex Litigation, Fourth § 21.634 at 322 (2004). The fairness hearing will provide a forum for proponents and opponents to explain, describe or challenge the terms and conditions of the class certification and settlement, including the fairness, adequacy and reasonableness of the settlement and the motion for attorney's fees, costs and expenses. Accordingly, Plaintiffs request that the Court schedule the time, date, and place of the final fairness hearing.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the class

for settlement purposes, preliminarily approve the proposed settlement and notice plan, and grant

the other relief requested in the motion.


**THE STOP & SHOP SUPERMARKET
COMPANY, GIANT OF MARYLAND,
LLC, and AMERICAN SALES CO., INC.**

Dated:  October 22, 2004                                By Their Attorneys,


Jeffrey L. Kodroff
David Felderman
SPECTOR ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Phone:   (215) 496-0300
Fax:      (215) 496-6611

Thomas M. Sobol
HAGENS BERMAN LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Phone:   (617) 482-3700
Fax:      (617) 482-3003

Steve W. Berman
Craig R. Spiegel
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Phone:   (206) 623-7292
 Fax:     (206) 623-0594

*Counsel for The Stop & Shop Supermarket
Company, et al.*

# EXHIBIT 1

**Direct Purchaser Damage Analysis: Generic Entry May 25, 2001**
**Table 1: Paxil and Generic Paroxetine Wholesale Sales and Prices**

| Month-Year | Paxil [1] Total Ext Units (EUs) | Paxil [1] Total Sales ($s) | Paxil [1] Average Price ($/EU) | Paid CR Total Ext Units (EUs) | Paid CR Total Sales ($s) | Paid CR Average Price ($/EU) | Paroxetine [2] Total Ext Units (EUs) | Paroxetine [2] Total Sales ($s) | Paroxetine [2] Average Price ($/EU) | Total Molecule Total Ext Units (EUs) |
|---|---|---|---|---|---|---|---|---|---|---|
| May-01 | 77,142,000 | 160,299,000 | 2.08 | | | | | | | 77,142,000 |
| Jun-01 | 83,719,000 | 190,201,000 | 2.13 | | | | | | | 83,719,000 |
| Jul-01 | 78,950,000 | 163,893,000 | 2.13 | | | | | | | 78,950,000 |
| Aug-01 | 79,828,000 | 170,473,000 | 2.14 | | | | | | | 79,828,000 |
| Sep-01 | 95,959,000 | 204,712,000 | 2.13 | | | | | | | 95,959,000 |
| Oct-01 | 80,186,000 | 171,280,000 | 2.14 | | | | | | | 80,186,000 |
| Nov-01 | 81,803,000 | 174,314,000 | 2.13 | | | | | | | 81,803,000 |
| Dec-01 | 104,607,000 | 223,916,000 | 2.14 | | | | | | | 104,607,000 |
| Jan-02 | 87,062,000 | 191,551,000 | 2.20 | | | | | | | 87,062,000 |
| Feb-02 | 87,675,000 | 194,706,000 | 2.22 | | | | | | | 87,675,000 |
| Mar-02 | 112,039,000 | 248,973,000 | 2.22 | | | | | | | 112,039,000 |
| Apr-02 | 87,125,000 | 193,345,000 | 2.22 | 3,447,000 | 7,673,000 | 2.20 | | | | 90,572,000 |
| May-02 | 87,634,000 | 194,376,000 | 2.22 | 2,745,000 | 6,134,000 | 2.23 | | | | 90,379,000 |
| Jun-02 | 107,028,000 | 236,348,000 | 2.21 | 5,713,000 | 12,717,000 | 2.23 | | | | 112,741,000 |
| Jul-02 | 83,609,000 | 183,656,000 | 2.20 | 6,786,000 | 15,136,000 | 2.23 | | | | 90,395,000 |
| Aug-02 | 81,135,000 | 178,830,000 | 2.20 | 8,818,000 | 19,860,000 | 2.23 | | | | 90,053,000 |
| Sep-02 | 99,445,000 | 217,977,000 | 2.19 | 13,860,000 | 30,612,000 | 2.22 | | | | 113,305,000 |
| Oct-02 | 76,597,000 | 168,375,000 | 2.20 | 13,820,000 | 30,733,000 | 2.22 | | | | 90,417,000 |
| Nov-02 | 75,066,000 | 164,677,000 | 2.19 | 16,138,000 | 35,013,000 | 2.22 | | | | 90,804,000 |
| Dec-02 | 91,585,000 | 202,425,000 | 2.21 | 21,247,000 | 47,415,000 | 2.23 | | | | 112,832,000 |
| Jan-03 | 75,246,000 | 166,681,000 | 2.22 | 20,029,000 | 44,968,000 | 2.23 | | | | 95,275,000 |
| Feb-03 | 72,530,000 | 165,652,000 | 2.28 | 21,276,000 | 49,173,000 | 2.31 | | | | 93,805,000 |
| Mar-03 | 88,651,000 | 202,160,000 | 2.28 | 27,614,000 | 64,405,000 | 2.31 | | | | 116,465,000 |
| Apr-03 | 66,694,000 | 154,208,000 | 2.31 | 22,604,000 | 52,457,000 | 2.32 | | | | 89,498,000 |
| May-03 | 64,964,000 | 149,521,000 | 2.30 | 23,617,000 | 54,516,000 | 2.32 | | | | 88,481,000 |
| Jun-03 | 81,898,000 | 187,244,000 | 2.29 | 32,201,000 | 74,376,000 | 2.31 | | | | 113,697,000 |
| Jul-03 | 60,765,000 | 139,582,000 | 2.30 | 25,193,000 | 58,163,000 | 2.31 | | | | 85,948,000 |
| Aug-03 | 61,731,000 | 140,529,000 | 2.28 | 26,292,000 | 60,672,000 | 2.31 | | | | 88,023,000 |
| Sep-03 | 48,639,000 | 109,587,000 | 2.28 | 33,590,000 | 77,398,000 | 2.30 | 51,514,000 | 82,599,000 | 1.60 | 133,840,000 |
| Oct-03 | 16,598,000 | 35,287,000 | 2.13 | 28,454,000 | 65,862,000 | 2.30 | 39,749,000 | 63,309,000 | 1.59 | 84,799,000 |
| Nov-03 | 14,476,000 | 31,834,000 | 2.21 | 29,018,000 | 66,900,000 | 2.31 | 42,262,000 | 66,082,000 | 1.56 | 85,776,000 |
| Dec-03 | 15,674,000 | 35,091,000 | 2.25 | 35,802,000 | 84,274,000 | 2.35 | 55,277,000 | 84,453,000 | 1.53 | 106,653,000 |
| Jan-04 | 10,128,000 | 22,960,000 | 2.27 | 28,771,000 | 66,887,000 | 2.39 | 46,618,000 | 71,180,000 | 1.53 | 85,416,000 |
| Feb-04 | 8,761,000 | 20,138,000 | 2.29 | 28,973,000 | 68,930,000 | 2.39 | 46,476,000 | 70,475,000 | 1.52 | 84,232,000 |
| Mar-04 | 10,131,000 | 23,241,000 | 2.29 | 36,378,000 | 86,804,000 | 2.38 | 56,088,000 | 82,891,000 | 1.42 | 104,596,000 |

Source: IMS National Sales Perspective Data.

Notes:

[1] Paxil Extended Units and Sales totals do not include the CR or Ready-Made formulations.

[2] Generic Paroxetine Extended Units and Sales totals do not include records identified as repackages.

**Direct Purchaser Damage Analysis: Generic Entry May 25, 2001**
**Table 2: Paxil Yardstick Inputs**

| Month-Year | Yardsticks [1] | | |
|---|---|---|---|
| | Brand Price Change [2] | Generic Price Change [2] | Generic Market Share |
| May-01 | | | |
| Jun-01 | | | |
| Jul-01 | | | |
| Aug-01 | | | |
| Sep-01 | | | |
| Oct-01 | | | |
| Nov-01 | | | |
| Dec-01 | | | |
| Jan-02 | | | |
| Feb-02 | | | |
| Mar-02 | | | |
| Apr-02 | | | |
| May-02 | | | |
| Jun-02 | | | |
| Jul-02 | | | |
| Aug-02 | | | |
| Sep-02 | | | |
| Oct-02 | | | |
| Nov-02 | | | |
| Dec-02 | | | |
| Jan-03 | | | |
| Feb-03 | | | |
| Mar-03 | | | |
| Apr-03 | | | |
| May-03 | | | |
| Jun-03 | | | |
| Jul-03 | | | |
| Aug-03 | | | |
| Sep-03 | -1.0% | -29.7% | 51.6% |
| Oct-03 | -6.6% | -30.2% | 70.6% |
| Nov-03 | -3.5% | -31.6% | 74.6% |
| Dec-03 | -1.2% | -33.0% | 78.0% |
| Jan-04 | -0.6% | -32.9% | 82.1% |
| Feb-04 | 0.6% | -33.5% | 84.1% |
| Mar-04 | 0.6% | -37.8% | 85.1% |

Source: IMS National Sales Perspective Data.

Notes:

[1] Brand Price, Generic Price and Generic Market Share Yardsticks are all calculated from IMS National Sales Perspective Data.
[2] Brand and Generic Price Yardsticks are calculated with respect to the pre-generic brand price.

Direct Purchaser Damage Analysis: Generic Entry May 28, 2001 [4]
Table 3: Paxil Damages

| Month-Year | Actuals Brand Total Ext Units (EUs) | Actuals Brand Average Price ($/EU) | Actuals Generic Total Ext Units (EUs) | Actuals Generic Average Price ($/EU) | Yardsticks [1] Brand Price Changes | Yardsticks Generic Price Changed | Yardsticks Generic Market Share [2] | But-For Brand But-For Units [3] | But-For Brand But-For Price | But-For Generic But-For Units [3] | But-For Generic But-For Price | Damages Brand Loyalists | Damages Generic Switchers | Damages Foreclosed Generics | Damages Total Damages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May-01 | 77,142,000 | 2.08 | | | -1.0% | -29.7% | 51.5% | 29,663,022 | 2.08 | 31,472,428 | 1.46 | 2,047,809 | 0 | 20,932,653 | 22,980,383 |
| Jun-01 | 83,719,000 | 2.13 | | | -8.6% | -30.2% | 70.6% | 14,783,748 | 1.94 | 35,424,817 | 1.45 | 2,801,819 | 0 | 24,060,804 | 26,862,622 |
| Jul-01 | 78,950,000 | 2.13 | | | -3.3% | -31.6% | 74.6% | 13,279,177 | 2.01 | 38,786,278 | 1.42 | 1,678,868 | 0 | 27,616,713 | 29,295,579 |
| Aug-01 | 79,828,000 | 2.14 | | | -1.2% | -33.0% | 78.0% | 13,767,335 | 2.08 | 40,828,089 | 1.39 | 1,116,109 | 0 | 28,195,846 | 37,312,263 |
| Sep-01 | 96,959,000 | 2.13 | | | -0.6% | -32.9% | 82.1% | 9,347,108 | 2.08 | 42,932,278 | 1.39 | 670,059 | 0 | 31,890,762 | 32,960,821 |
| Oct-01 | 80,155,000 | 2.14 | | | 0.6% | -33.5% | 84.1% | 8,476,625 | 2.09 | 44,875,046 | 1.38 | 356,983 | 0 | 33,546,597 | 34,033,630 |
| Nov-01 | 81,803,000 | 2.13 | | | 0.5% | -37.5% | 85.1% | 10,132,162 | 2.09 | 58,084,894 | 1.28 | 517,969 | 0 | 49,303,740 | 49,821,709 |
| Dec-01 | 104,907,000 | 2.14 | | | 0.5% | -38.5% | 87.7% | 7,003,761 | 2.08 | 49,774,857 | 1.28 | 823,130 | 0 | 45,907,882 | 46,730,812 |
| Jan-02 | 67,062,000 | 2.20 | | | 0.2% | -38.5% | 90.2% | 5,824,079 | 2.08 | 51,559,830 | 1.28 | 776,377 | 0 | 49,337,844 | 50,114,220 |
| Feb-02 | 67,975,000 | 2.22 | | | 0.2% | -39.8% | 90.2% | 7,186,864 | 2.08 | 65,887,176 | 1.25 | 1,002,398 | 0 | 64,085,254 | 65,087,652 |
| Mar-02 | 112,059,000 | 2.22 | | | 0.3% | -40.5% | 90.2% | 6,809,913 | 2.08 | 53,283,000 | 1.24 | 782,723 | 0 | 62,047,895 | 63,167,362 |
| Apr-02 | 97,125,000 | 2.22 | | | 0.2% | -41.2% | 90.2% | 5,797,532 | 2.08 | 53,149,801 | 1.22 | 784,513 | 0 | 62,329,461 | 63,732,108 |
| May-02 | 87,654,000 | 2.22 | | | 0.2% | -41.9% | 90.2% | 7,231,985 | 2.08 | 66,300,003 | 1.21 | 906,028 | 0 | 69,320,483 | 67,287,609 |
| Jun-02 | 107,028,000 | 2.21 | | | 0.2% | -42.5% | 90.2% | 5,798,559 | 2.08 | 52,967,789 | 1.19 | 674,216 | 0 | 54,243,415 | 54,107,998 |
| Jul-02 | 83,609,000 | 2.20 | | | 0.2% | -43.2% | 90.2% | 5,776,621 | 2.08 | 66,631,676 | 1.18 | 701,164 | 0 | 88,371,072 | 54,844,579 |
| Aug-02 | 81,135,000 | 2.20 | | | 0.2% | -43.9% | 90.2% | 7,266,164 | 2.08 | 63,171,648 | 1.17 | 783,760 | 0 | 55,637,981 | 69,185,332 |
| Sep-02 | 99,445,000 | 2.19 | | | 0.2% | -44.6% | 90.2% | 5,794,970 | 2.08 | 63,386,433 | 1.15 | 669,713 | 0 | 56,387,036 | 56,307,394 |
| Oct-02 | 78,597,000 | 2.20 | | | 0.2% | -45.2% | 90.2% | 5,834,796 | 2.08 | 66,383,617 | 1.14 | 646,774 | 0 | 72,088,849 | 57,033,882 |
| Nov-02 | 76,098,000 | 2.19 | | | 0.2% | -45.8% | 90.2% | 7,237,823 | 2.08 | 62,079,882 | 1.12 | 922,946 | 0 | 62,079,882 | 73,011,595 |
| Dec-02 | 91,685,000 | 2.21 | | | 0.2% | -46.4% | 90.2% | 6,111,692 | 2.08 | 66,028,770 | 1.11 | 826,560 | 0 | 85,977,434 | 62,905,452 |
| Jan-03 | 75,246,000 | 2.22 | | | 0.2% | -46.6% | 90.2% | 6,004,470 | 2.08 | 55,046,827 | 1.11 | 1,270,636 | 0 | 82,281,311 | 87,248,270 |
| Feb-03 | 72,300,000 | 2.28 | | | 0.2% | -47.3% | 90.2% | 7,470,868 | 2.08 | 55,048,927 | 1.10 | 1,495,223 | 0 | 65,129,745 | 83,766,534 |
| Mar-03 | 88,551,000 | 2.28 | | | 0.2% | -47.9% | 90.2% | 5,741,019 | 2.08 | 52,831,409 | 1.09 | 1,277,574 | 0 | 64,927,369 | 66,407,319 |
| Apr-03 | 86,884,000 | 2.31 | | | 0.2% | -48.6% | 90.2% | 5,675,782 | 2.08 | 52,033,338 | 1.07 | 1,242,277 | 0 | 83,670,708 | 66,170,132 |
| May-03 | 64,984,000 | 2.30 | | | 0.2% | -49.3% | 90.2% | 7,306,139 | 2.08 | 65,975,516 | 1.05 | 1,628,705 | 0 | 64,275,539 | 85,399,491 |
| Jun-03 | 81,696,000 | 2.29 | | | 0.2% | -50.0% | 90.2% | 5,513,296 | 2.08 | 60,543,747 | 1.04 | 1,163,983 | 0 | 65,717,637 | 65,469,422 |
| Jul-03 | 60,755,000 | 2.30 | | | 0.2% | -50.9% | 90.2% | 6,682,402 | 2.08 | 51,764,000 | 1.03 | 1,121,426 | 0 | | 66,839,063 |
| Aug-03 | 61,731,000 | 2.28 | 51,514,000 | 1.60 | 0.2% | -51.3% | 90.2% | 6,692,691 | 2.08 | 57,590,152 | 1.01 | 1,501,476 | 31,200,072 | 34,118,216 | 68,819,664 |
| Sep-03 | 48,536,000 | 2.28 | 39,748,000 | 1.58 | 0.3% | -52.0% | 90.2% | 5,457,666 | 2.08 | 49,850,409 | 1.00 | 257,633 | 24,205,465 | 11,579,490 | 39,042,499 |
| Oct-03 | 16,688,000 | 2.13 | 42,282,000 | 1.53 | 0.3% | -52.7% | 90.2% | 5,502,264 | 2.08 | 50,442,599 | 0.98 | 678,272 | 26,078,748 | 10,088,454 | 35,845,472 |
| Nov-03 | 14,476,000 | 2.21 | 55,277,000 | 1.53 | 0.3% | -53.3% | 90.2% | 6,841,459 | 2.08 | 62,719,611 | 0.97 | 1,196,152 | 31,651,898 | 9,666,499 | 42,474,548 |
| Dec-03 | 15,030,000 | 2.25 | 45,516,000 | 1.53 | 0.3% | -54.0% | 90.2% | 5,479,300 | 2.08 | 50,232,068 | 0.96 | 1,009,604 | 27,370,860 | 4,920,660 | 33,301,154 |
| Jan-04 | 10,128,000 | 2.27 | 48,476,000 | 1.52 | 0.2% | -54.7% | 90.2% | 5,403,221 | 2.08 | 27,367,240 | 0.94 | 1,138,113 | 27,367,240 | 4,176,896 | 32,672,250 |
| Feb-04 | 8,731,000 | 2.27 | 48,476,000 | 1.52 | 0.2% | -55.4% | 90.2% | 5,709,445 | 2.08 | 48,534,613 | 0.93 | 1,417,862 | 29,313,501 | 4,722,003 | 35,454,470 |
| Mar-04 | 10,131,000 | 2.29 | 58,088,000 | 1.42 | 0.2% | -56.0% | 90.2% | 5,709,445 | 2.08 | 61,509,565 | 0.91 | | | | |
| **Totals:** | | | | | | | | 269,191,758 | | 1,842,418,320 | | 35,797,828 | 199,178,061 | 1,548,275,611 | 1,760,251,320 |

Notes:

[1] Yardsticks used from June 2001 through December 2001 are calculated from actual generic entry data (see Table 2). Post-December 2001, Yardsticks are based on averages calculated from other SSRIs.

[2] Generic Market Share is calculated as a percentage of the total units of Paxil and generic Paroxetine.

[3] Brand and Generic But-For Units are calculated with respect to the actual total demand for the Paroxetine HCl molecule found in Table 1, less a constant percentage of CR sales (34.8%).

[4] The but-for generic entry date of May 28, 2001 is rounded and assumed to occur on June 1, 2001.

Page 1 of 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE STOP & SHOP SUPERMARKET COMPANY, GIANT OF MARYLAND, LLC and AMERICAN SALES COMPANY, INC., | Docket No. 03-4578 |
| Plaintiffs, | |
| v. | |
| SMITHKLINE BEECHAM CORPORATION, | |
| Defendant. | |

**DECLARATION OF JEFFREY L. KODROFF IN SUPPORT OF
PLAINTIFFS' MOTION FOR CERTIFICATION OF A SETTLEMENT
CLASS AND FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Jeffrey L. Kodroff, declare:

1.     I am a partner with Spector Roseman & Kodroff, P.C. and am one of the Co-Lead

Counsel for Plaintiffs and the class in this action.  I have personal knowledge of the facts set

forth in this declaration.

2.     Claims held either directly or through assignment by CVS Meridian, Inc., Rite

Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company,

Safeway, Inc. and Hy-Vee, Inc. are excluded from the Settlement Class that Plaintiffs seek to

have certified in this action, because they have been represented on an individual basis by

separate counsel and have reached a separate settlement with GSK.  Those entities have

established that they accounted for slightly more than one-third of the purchases of Paxil by

direct purchasers during the Class period. *Id.* Their counsel have informed Thomas Sobol, my Co-Lead Counsel, and I that their settlement is consistent with the $100 million Class Settlement.

3.      Attached as Exhibit 1 is a true and correct copy of the damage study prepared for Plaintiffs and the Class in this action by Greylock McKinnon of Cambridge, Massachusetts. The damage figures in that study ***include*** the damages suffered by the eight entities listed in paragraph 2 of this declaration. In addition, the study does not account for generic bypass. Therefore, that study substantially overstates the damages suffered by the Settlement Class.

4.      I am aware of the following settlement information: (1) in the Cardizem settlement the direct class members recovered approximately 15% of the total class period expenditures; (2) in the BuSpar settlement the direct class members recovered approximately 6% of the total class period expenditures; (3) in the Lorazapam and Clorazepate settlements the direct class members recovered approximately 6% of the total class period expenditures; (4) in the Taxol settlement the direct class members recovered approximately 2% of the total class period expenditures; and (5) in the Relafen settlement the direct class members recovered approximately 7% of the total class period expenditures.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 22, 2004

_____
Jeffrey L. Kodroff

- 2 -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

THE STOP & SHOP SUPERMARKET
COMPANY, GIANT OF MARYLAND, LLC
and AMERICAN SALES COMPANY, INC.,

                    Plaintiffs,

     v.

SMITHKLINE BEECHAM CORPORATION,

                    Defendant.

Docket No. 03-4578

## ESCROW AGREEMENT

This escrow agreement ("Escrow Agreement"), by and among (a) Co-Lead Counsel for

Plaintiffs and for the Settlement Class in *The Stop & Shop Supermarket Co., et. al. v. Smithkline*

*Beecham Corp.*, Docket No. 03-4578 (E.D. Pa.), on behalf of Plaintiffs, individually, and on

behalf of the Settlement Class (collectively, the "Settlement Class"); (b) Defendant SmithKline

Beecham Corporation d/b/a GlaxoSmithKline ("GSK"); and (c) Matthew Pohl as escrow agent

(the "Escrow Agent"), is entered into in connection with the Settlement Agreement in this action,

dated October 21, 2004 (the "Settlement Agreement").

      1.     The Settlement Class and GSK, by and through their respective counsel, have

entered into the Settlement Agreement wherein the above parties agree, subject to final approval

of the Court, that the above action be dismissed with prejudice against GSK in exchange for,

inter alia, payment in the amount of One Hundred Million Dollars ($100,000,000) in cash, as set

forth in the Settlement Agreement.

47233

1

2.     The parties hereto are entering into this Escrow Agreement in order to resolve the above-referenced litigation, and to effectuate the terms of the Settlement Agreement as between the parties to it.

3.     NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and considerations therein, the parties to this agreement agree as follows:

(a)     No later than five business days after Plaintiffs file their motion for preliminary approval of the Settlement Agreement, GSK will transfer One Hundred Million Dollars ($100,000,000) (the "Settlement Fund") in cash into an escrow account held by Merrill Lynch and administered by the Escrow Agent, as defined in this agreement. If full payment of One Hundred Million Dollars ($100,000,000) in cash is not transferred into such escrow account by such time, Plaintiffs shall have the right to withdraw from the Settlement Agreement.

(b)     The Escrow Agent shall cause the Settlement Fund to be invested and reinvested in short-term United States Treasury bills or other similar short-term United States government obligations or short-term federally insured bank certificates of deposit, until the Settlement Agreement is deemed to have become effective in accordance with Paragraph 5 of the Settlement Agreement. Once the Settlement Agreement is deemed to have become final, the Settlement Fund shall be invested in like debt securities by the Escrow Agent as directed by Co-Lead Counsel for the Settlement Class. The term of any such investment shall not exceed ninety days. All interest earned on the Settlement Fund shall become part of the Settlement Fund for the benefit of the Settlement Class. Any losses on the Settlement Fund shall be borne by the Settlement Fund and shall not be recoverable from GSK. The Escrow Agent shall not be liable for any losses resulting from any depreciation in the market value of any such investments (unless the loss is attributable to a failure to adhere to the investment limitations defined in this

47233

2

paragraph).

      (c)    The Escrow Agent may withdraw from the Settlement Fund disbursements sufficient to pay the costs of notice to the Class, as ordered by the Court, and taxes or estimated taxes payable by the Escrow Agent on behalf of the Settlement Fund in accordance with paragraph 3(d)(4) herein.  Co-Lead Counsel are authorized to appoint an administrator (and any successor) for the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3) (the "Claims Administrator").  Co-Lead Counsel shall be responsible for assuring that the Claims Administrator qualifies as an "Administrator" of the Settlement Fund within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and is performing its duties hereunder.  GSK shall have no responsibility for any fees or the performance of the Claims Administrator.

      (d)    Following preliminary approval by the Court of the settlement, the Claims Administrator shall promptly take all steps necessary so that the Settlement Fund qualifies as a "Qualified Settlement Fund" within the meaning of Treasury Regulation § 1.468B-1.  These steps include, without limitation, the following:

      (1)    The Claims Administrator will promptly prepare a "Regulation Section 1.468B-3 Statement" fulfilling the requirements of Treasury Regulation Section 1.468B-3(e) on behalf of GSK and promptly provide copies to GSK's counsel for review and approval.

      (2)    The Claims Administrator will promptly prepare and attach to the Settlement Fund's income tax return for the taxable year 2004, in which the Settlement Fund is treated as coming into existence, a "Regulation Section 1.468B-1 Relation Back Election" that satisfies the requirements of Treasury Regulations § 1.468B-1(j) for execution by GSK and the Claims Administrator, who will promptly forward a copy of the "Regulation Section 1.468B-1 Relation Back Election" to GSK's counsel within 30 days after the date hereof.

47233

(3)    The Claims Administrator will timely prepare and timely file on behalf of the Settlement Fund (i) federal tax returns, including without limitation information returns in accordance with Treasury Regulations Section 1.468B-2 and the other provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) all necessary state, local and foreign tax returns.

(4)    Notwithstanding any effort, or failure, of the Claims Administrator and the parties hereto to treat the Settlement Fund as a "Qualified Settlement Fund" within the meaning of Treasury Regulation Section 1.468B-1 effective as of the date hereof, any additional tax liability, interest payable to any taxing authority, or penalties incurred by GSK resulting from income earned by the Settlement Fund (or the receipt of any payment under this paragraph 3(d)(4)) shall be reimbursed from the Settlement Fund in an amount that will make GSK whole on an after-tax basis upon GSK's written request to the Escrow Agent, a copy of which shall be provided simultaneously to Co-Lead Counsel. The Escrow Agent is authorized to withdraw from the Settlement Fund (i) monies to pay all applicable federal, state, local or foreign taxes which the Settlement Fund owes or is estimate to owe, and (ii) to pay any reimbursements to GSK as described in this subparagraph (4).

(e)    The Escrow Agent may sell or present for redemption any investment described in paragraph 2(b) above, whenever it shall be necessary in order to provide funds to meet any payment required pursuant to this Escrow Agreement or the settlement documentation.

(f)    Should the Court approve the settlement after conducting a fairness hearing, the Escrow Agent shall distribute from the Settlement Fund such amounts approved by the Court for attorney's fees and expenses as well as any incentive award for the Plaintiffs. Once the Settlement Agreement is deemed final, (1) Co-Lead Counsel for the Settlement Class shall

47233

4

have the authority to appoint a Successor Escrow Agent and to direct that all funds be transferred to the Successor Escrow Agent, which Successor Escrow Agent shall not be GSK or an affiliate of GSK, (2) the Escrow Agent or Successor Escrow Agent shall distribute the Settlement Fund in accordance with the terms of the Settlement Agreement and any applicable Court orders, and (3) GSK's interest in the Settlement Fund shall cease in its entirety.

(g)     In the event the Settlement Agreement is terminated in accordance with paragraph 13 and 14 thereof or is modified in accordance with paragraph 12 thereof, the Escrow Agent shall, subject only to the expiration of any time deposit investment(s) not to exceed ninety days, return (1) in the case of termination, the remaining Settlement Fund including all interest thereon, less any taxes, costs, expenses or refund referred to in ¶¶ 3(c), 3(d)(4) or 3(n), or (2) in the case of modification, an amount calculated in accordance with the terms of paragraph 12 of the Settlement Agreement, including all interest thereon, to GSK within five business days of notice by the parties hereto.

(h)     The Escrow Agent may rely upon any notice, certificate, instrument, request, paper or other documents reasonably believed by it to be genuine and to have been made, sent or signed by counsel for the respective party or parties in accordance with this Escrow Agreement, and shall not be liable for any action taken or omitted by it, consistent with the terms hereof, in connection with the performance by it of its duties pursuant to the provisions of this Escrow Agreement, except for its own default, negligence or breach of the terms of this Escrow Agreement.

(i)     The Escrow Agent's acceptance and administration of the Settlement Fund shall constitute the submission of the Escrow Agent to the jurisdiction of the Court in the above-described litigation for the purpose of carrying out this Escrow Agreement.

47253

5

(j)    The Escrow Agent has been appointed in compliance with the Settlement Agreement and is subject to the orders of the Court.

(k)    This Escrow Agreement shall be governed by and interpreted according to the substantive laws of the Commonwealth of Pennsylvania, without reference to choice-of-law principles; provided, however, that with respect to tax matters, this Escrow Agreement shall be governed and interpreted according to federal law.

(l)    The Escrow Agent is and shall be independent, and neither GSK nor the Settlement Class nor their attorneys shall have any authority whatever relative to the investment of the Settlement Fund prior to the Settlement Agreement becoming final, provided that as parties hereto, GSK and the Settlement Class shall be entitled to institute actions to compel or require performance by the Escrow Agent of its obligations hereunder. The Escrow Agent hereby agrees to submit to the jurisdiction and venue of the Court with respect to issues relating to the Settlement Fund for purposes of enforcement, clarification or amendment of the provisions of this Escrow Agreement, and to comply with all directions given by that Court.

(m)    The Escrow Agent may be removed from this Escrow Agreement at any time and thereby become discharged from the obligations hereby created subsequent to the date of discharge, by notice in writing given to the Escrow Agent by all undersigned counsel not less than thirty (30) days before such removal is to take effect.

(n)    The Escrow Agent shall be reimbursed for all its reasonable out-of-pocket expenses, including attorney's fees, travel expenses, telephone and facsimile transmittal costs, postage (including express mail and overnight delivery charges), copying charges and the like. All such fees and expenses shall constitute a direct charge against the Settlement Fund. The Escrow Agent is authorized to, and may, disburse to itself, from the Settlement Fund, from time

47233

6

to time, the amount of reimbursement of out-of-pocket expenses due and payable hereunder.  The
Escrow Agent shall notify the undersigned counsel of any disbursement from the Settlement
Fund to itself and shall furnish the undersigned counsel copies of all related invoices and other
statements.

(o)    Copies of all notices and correspondence sent pursuant to this Escrow
Agreement shall be served by U.S. mail or electronically upon all undersigned counsel and the
Escrow Agent, until such time as the Settlement becomes effective in accordance with the
Settlement Agreement.  Upon the Settlement becoming effective, GSK's interest in the
Settlement Fund shall cease in its entirety, and after such time, copies of such notices and
correspondence shall be served only on Co-Lead Counsel.

(p)    The Escrow Agent shall, upon request of any party, advise counsel for the
parties of any maturities, conversion privileges, and other matters of a like manner concerning
the investments held in accordance with this agreement, until such time as the Settlement
becomes effective in accordance with the Settlement Agreement.  After such time, only Co-Lead
Counsel shall be advised on any such maturities, conversion privileges and other such matters
concerning the investments held in accordance with this agreement.

(q)    The Escrow Agent shall furnish to counsel for the parties, upon their
request, monthly statements of transactions certified by the Escrow Agent, which include without
limitation deposits made, interest earned and disbursements made from the Settlement Fund,
until such time as the Settlement becomes final in accordance with the Settlement Agreement.
After such time, such statements shall be furnished only to Co-Lead Counsel.

(r)    The parties reserve the right to modify this Escrow Agreement upon
written agreement of all parties other than the Escrow Agent, except any modification which

47233

7

shall affect the duties or responsibilities of the Escrow Agent may be made only upon agreement of all parties including the Escrow Agent, until such time as the Settlement becomes final in accordance with the Settlement Agreement.  After such time, only the written authorization of Co-Lead Counsel shall be required for modification except any modification which shall affect the duties or responsibilities of the Escrow Agent in which case, modification requires written agreement of Co-Lead Counsel and the Escrow Agent.

      (s)    The Escrow Agent shall treat the fact of the settlement and the Settlement Agreement referred to herein, as well as all facts or other information pertaining to the settlement and Settlement Agreement, as confidential and shall not disclose or use such information in any way other than as necessary to fulfill its role as Escrow Agent.  The Escrow Agent shall execute an agreement with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), as holder of the escrow account ("Confidentiality Agreement"), and shall cause Merrill Lynch to enter into such agreement, pursuant to which Merrill Lynch will agree to treat all facts and information pertaining to the settlement and Settlement Agreement as confidential, and shall not disclose or use such information in any way other than as necessary to fulfill its roles as holder of the escrow account.

      (t)    This Escrow Agreement may be signed by all parties on separate copies, including facsimile copies, and shall have full force and effect when all parties have signed one of the copies.

47233

8

Dated:  October 21, 2004

ASSENTED TO AND AGREED BY AND AMONG:

DECHERT, LLP

Joseph A. Tate, Esq.
George G. Gordon, Esq.
Christine C. Levin, Esq.
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793
Tel:  (215) 994-4000
Fax:  (212) 994-2222

*Counsel for SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline*

-AND-

SPECTOR ROSEMAN & KODROFF PC.

Jeffrey L. Kodroff, Esq.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Tel: (412) 642-2300
Fax: (412) 642-2309

*Direct Purchaser Co-Lead Counsel*

HAGENS BERMAN LLP

Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA  02142
Tel:  (617) 482-3700
Fax:  (617) 823-8800

47233

9

*Direct Purchaser Co-Lead Counsel*

-AND-

**MATTHEW POHL**

Class Action Administration, Inc.
10875 Dover St, Suite 300
Westminster, CO 80021
Tel: (720) 540-4422
Fax: (720) 540-4423

*Escrow Agent*

47233

10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

THE STOP & SHOP SUPERMARKET
COMPANY, GIANT OF MARYLAND, LLC
and AMERICAN SALES COMPANY, INC.,

                        Plaintiffs,

     v.

SMITHKLINE BEECHAM CORPORATION,

                        Defendant.

Docket No. 03-4578

## [PROPOSED] FINAL ORDER AND JUDGMENT

This Court having considered:  (a) the Settlement Agreement between Plaintiffs, the

Settlement Class and defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline

("GSK"); (b) the proposed allocation and distribution of the Settlement Fund; and (c) Co-Lead

Counsel's application for attorneys' fees, reimbursement of litigation expenses and incentive

awards for the Settlement Class representative; having held a fairness hearing on _____,

2004; having considered all of the submissions and arguments with respect thereto; and

otherwise being fully informed and good cause appearing therefor,

       IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

       1.      Unless otherwise provided herein, the terms defined in the Settlement Agreement

shall have the same meanings for purposes of this Final Order and Judgment.

       2.      The Court has personal jurisdiction over the Settlement Class and Defendant, and

has subject matter jurisdiction to approve the Settlement Agreement.

3.      Based on the record before the Court, including the submissions in support of the

Settlement, objections and responses thereto, the Court hereby certifies, for settlement purposes,

the following class:

> All persons or entities in the United States or its territories who purchased Paxil®
> directly from SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline at any
> time during the period of December 29, 1997, through September 30, 2004.
> Excluded from the class are SmithKline, and its employees, subsidiaries and
> affiliates, and all government entities.  Also excluded from the Class are claims
> held by, either directly or through assignment, CVS Meridian, Inc., Rite Aid
> Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger
> Company, Saveway, Inc. and Hy-Vee, Inc.

In so holding, the Court finds that the prerequisites of Rule 23(a) and (b)(3) have been

satisfied for certification of the Settlement Class for settlement purposes.  The Settlement Class,

numbering in the millions, is so numerous that joinder of all members is impracticable; there are

a number of questions of law and fact common to the Settlement Class, such as whether GSK

violated the law by obtaining and attempting to enforce patents against pharmaceutical

manufacturers who sought to introduce generic versions of Paxil®; the claims and defenses of

the Settlement Class Representatives are typical of the claims and defenses of the Settlement

Class members; the Settlement Class Representatives and the Co-Lead Counsel have fairly and

adequately protected the interests of the Settlement Class in this litigation; questions of law and

fact predominate over questions affecting only individual Settlement Class members; and the

Settlement Class is superior to individual litigation as a method for the fair and efficient

adjudication of the claims at issue in this litigation.

In making all of the foregoing findings, the Court has exercised its discretion in certifying

a settlement class.  Defendant has preserved all of its defenses and objections against and rights

to oppose certification of a litigation class if the Settlement Agreement does not become final.

4.     The record shows that notice has been given to the Direct Purchaser Settlement

Class in the manner approved by the Court in its Order of _____, 2004

[Docket No. _____]. The Court finds that such notice: (i) is reasonable and constitutes

the best practicable notice; (ii) is reasonably calculated, under the circumstances, to apprise

Settlement Class members of the pendency of this action, the terms of the Settlement Agreement,

their right to object to or exclude themselves from the Settlement Agreement and to appear at the

settlement fairness hearing ("Fairness Hearing"); (iii) constitutes due, adequate, and sufficient

notice to all persons entitled to receive notice; and (iv) meets the requirements of due process and

Rule 23 of the Federal Rules of Civil Procedure.

5.     No individuals or entities, other than those listed on Exhibit A hereto, have

excluded themselves from the Settlement Class.  This Order shall have no force or effect on the

persons or entities listed on Exhibit A hereto.

6.     The Court finds that extensive arm's-length negotiations have taken place in good

faith between Co-Lead Counsel for Plaintiffs and the Settlement Class and Defendant's counsel,

resulting in the Settlement Agreement.

7.     Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court hereby

finally approves in all respects the Settlement Agreement and finds that the Settlement

Agreement and the plan of allocation are, in all respects, fair, reasonable, adequate, and in the

best interest of the Settlement Class.  The Court further approves the establishment of the

Settlement Fund under the terms and conditions set forth in the Settlement Agreement and the

Escrow Agreement.  The parties are hereby directed to implement and consummate the

Settlement Agreement according to its terms and provisions.  In addition, the parties are

authorized to agree to and adopt such amendments and modifications to the Settlement

Agreement as (i) shall be consistent in all material respects with this Final Order and Judgment, and (ii) do not limit the rights of Settlement Class members.

8.      This action is hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.

9.      Upon the Settlement Agreement becoming final, as defined therein, Defendant and its present and former parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, employees, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Settlement Class who have not timely excluded themselves from the Class Action (as used throughout this paragraph 9, references to the "Class," "members of the Class" or "Class members" include any of their past, present or future officers, directors, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such), whether or not they object to the Settlement Agreement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of any conduct, events or transactions, prior to the date hereof, alleged or which could have been alleged in the Class Action relating to the marketing, sale, manufacture, pricing or purchase of, or the enforcement of intellectual property related to, the drug Paxil® or

any form of paroxetine, or in any way arising out of or related to GSK's agreement with Par

Pharmaceuticals ("Par") pursuant to which Par is selling paroxetine (the "Released Claims").

Each member of the Settlement Class shall not, hereafter, seek to establish liability against any

Released Party based, in whole or in part, on any of the Released Claims.

In addition, Plaintiffs and all members of the Settlement Class who have not timely

excluded themselves from the Class Action waive and release, upon the Settlement Agreement

becoming final, any and all provisions, rights, benefits conferred by § 1542 of the California

Civil Code, which reads:

> Section 15.42.  General Release; extent.  A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law of any state or territory of the United States, or principle of common law, which is

similar, comparable or equivalent to § 1542 of the California Civil Code.  Each Plaintiff or

Settlement Class member who has not timely excluded himself, herself or itself from the Class

Action may hereafter discover facts other than or different from those which he, she or it knows

or believes to be true with respect to the Released Claims, but each such person or entity waives

and fully, finally and forever settles and releases, upon the Settlement Agreement becoming

final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim with

respect to the subject matter of the Released Claims, whether or not concealed or hidden, without

regard to the subsequent discovery or existence of such different or additional facts.  With

respect to the Released Claims, each such person or entity also waives and fully, finally and

forever settles and releases any and all claims it may have against Defendant under § 17200, *et

seq.*, of the California Business and Professions Code.

10.     Reservation of Claims.  Notwithstanding the above, the Plaintiffs and Settlement Class members release only the Released Parties listed in paragraph 9 of this Order and do not release any rights they have or may have against any other party or entity whatsoever other than the Released Parties with respect to the Released Claims.  In addition, the Plaintiffs and Settlement Class members do not release any claims arising in the ordinary course of business between themselves and the Released Parties concerning product liability, breach of contract, breach of warranty, or personal injury.  Further, the Plaintiffs and Settlement Class members do not release any claims they have or may have as a class member in the putative class action captioned *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, pending in the United States District Court for the District of Massachusetts; provided, however, that in such litigation GSK preserves its right to assert that any recovery by a Class Member in such litigation related to the drug Paxil should be set-off by the Settlement Class member's pro-rata share of the Settlement Fund.

11.     The Court finds that the Settlement Fund is a "qualified settlement fund" as defined in section 1.468B-1(c) of the Treasury Regulations in that it satisfies each of the following requirements:

(a)     The Settlement Fund is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

(b)     The Settlement Fund is established to resolve or satisfy one or more claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liabilities; and

(c)     The assets of the Settlement Fund are segregated from other assets of GSK, the transferor of payments to the Settlement Fund.

12.    Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

(a)    The Settlement Fund met the requirements of paragraphs 11(b) and 11(c) of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

(b)    GSK and the Claims Administrator may jointly elect to treat the Settlement Fund as coming into existence as a "qualified settlement fund" on the later of the date the Settlement Fund met the requirements of paragraphs 11(b) and 11(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 11 of this Order are met.  If such relation-back election is made, the assets held by the Settlement Fund on such date shall be treated as having been transferred to the Settlement Fund on that date.

13.    Nothing in this Final Order and Judgment, the Settlement is, or shall be, deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Defendant.

14.    Co-Lead Counsel have moved pursuant to Rules 23(h), 54(d) and 52(a) of the Federal Rules of Civil Procedure for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rule 23(h)(3) and 52(a) this Court makes the following findings of fact and conclusions of law:

(a)    the Settlement Agreement confers a substantial benefit on the Settlement Class;

(b)    the value conferred on the Settlement Class is immediate and readily quantifiable, because each Settlement Class member will receive a cash payment that represents a significant portion of the alleged financial harm incurred as a result of Defendant's alleged conduct;

(c)      there was a substantial risk that neither the Plaintiffs nor the Class members would have obtained a judgment if this litigation had proceeded to trial, in light ot the complexities of the case and the arguments against liability made by Defendant's highly experienced and capable counsel;

(d)      the Settlement Class Representatives and Co-Lead Counsel vigorously and effectively pursued the Settlement Class members' claims before this Court in this highly complex case;

(e)      the Settlement Agreement was obtained as a direct result of Co-Lead Counsel's skillful advocacy;

(f)      the Settlement Agreement was negotiated in good faith and in the absence of collusion;

(g)      during the prosecution of this Class Action, Co-Lead Counsel incurred expenses in the amount of $_____, which included costs for expert witnesses and other expenses which the Court finds to be reasonable and necessary to the representation of the Settlement Class;

(h)      the Settlement Class members were advised in the "Notice of Pendency and Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Hearing" that Co-Lead Counsel intended to apply for an award of attorneys' fees in an amount up to 33-1/3 % of the Settlement Fund (plus interest thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

(i)      _____ member(s) of the Settlement Class has (have) submitted written objection(s) to the award of attorneys' fees and expenses;

-8-

(j)     counsel who recover a common fund for the benefit of persons other than themselves or their clients are entitled to a reasonable attorney's fee from the fund as a whole, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 866, 900 n.16 (1984);

(k)     the "percentage-of-recovery method has long been used in this Circuit in common-fund cases," *Welch & Forbes, Inc. v. Cedant Corp.*, 243 F.3d 722, (3d Cir. 2001); and

(l)     applying the factors set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), in light of the findings set forth above, the Court concludes that an award of $_____, which constitutes ____% of the Settlement Fund, is both reasonable and justified under the circumstances and when compared with awards in similar cases, *see, e.g., In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, *41-43 (E.D. Pa. June 2, 2004) (awarding 30 percent of settlement fund in antitrust action, listing numerous cases in which awards ranged from 25% to 36% of settlement fund, including one case "in which the court awarded class counsel in an early settlement one-third of a class action settlement of $200 million");

Accordingly, Co-Lead Counsel are hereby awarded $_____ from the Settlement Fund as their fee award, which the Court finds to be fair and reasonable and which amount shall be paid to Co-Lead Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement, with interest from October 4, 2004 (the date of the funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. Further, Co-Lead Counsel are hereby awarded $_____ for their expenses, which the Court finds to be fair and reasonable and which amount shall be paid to Co-Lead Counsel from Settlement Fund in accordance with the terms of the Settlement Agreement. The

-9-

award of attorneys' fees and expenses shall be allocated among all counsel representing the Settlement Class by Co-Lead Counsel.

15.     Without affecting the finality of this Final Order and Judgment, the Court retains continuing and exclusive jurisdiction over all matters relating to administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order and Judgment, to protect and effectuate this Final Order and Judgment, and for any other necessary purpose. Defendant, Plaintiffs and the members of the Settlement Class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, including the Exhibits thereto. Without limiting the generality of the foregoing, and without affecting the finality of this Final Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action or proceeding. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

16.     The Settlement Class Representatives are hereby granted incentive awards for representing the Settlement Class in the amount of $_____ each, which amount is in addition to whatever monies the Settlement Class Representatives will receive from the Settlement Fund pursuant to the Plan of Allocation.

17.     In the event that the settlement does not become effective according to the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as

provided by the Settlement Agreement and shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

IT IS SO ORDERED.


DATED:_____         _____

                                        Hon. John R. Padova

## **EXHIBIT A**

INDIVIDUALS AND ENTITIES THAT HAVE PROPERLY EXCLUDED
THEMSELVES FROM SETTLEMENT CLASS IN ACCORDANCE
WITH THE ORDER OF _____, 2004 (Docket No. ___).

**[list all]**

*The Stop & Shop Supermarket v. SmithKline Beecham Corp.*
Docket No. 03-4578

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October, 2004, I caused to be served a true and correct copy of the foregoing Plaintiffs' Motion for Certification of A Settlement Class and for Preliminary Approval of Settlement via Electronic Court Filing (ECF) upon defense counsel at the following address:

> Christine C. Levin, Esquire
> George G. Gordon, Esquire
> Joseph A. Tate, Esquire
> Will W. Sachse, Esquire
> *Dechert, LLP*
> 4000 Bell Atlantic Tower
> 1717 Arch Street
> Philadelphia, Pa. 19103

Jeffery Kodroff, Esquire