UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THE STOP & SHOP SUPERMARKET COMPANY, GIANT OF MARYLAND, LLC and AMERICAN SALES COMPANY, INC., | Docket No. 03-4578 |
| Plaintiffs, | |
| v. | |
| SMITHKLINE BEECHAM CORPORATION, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND FOR INCENTIVE AWARDS

Plaintiffs The Stop & Shop Supermarket Company, Giant of Maryland, LLC and American Sales Company, Inc. respectfully file this memorandum in support of their motion for approval of the $100 million Settlement Agreement, for approval of a plan of allocation, and for an incentive award of $15,000 to each Plaintiff.

This Court set a deadline of December 31, 2004, for Settlement Class members to object to any aspect of the Settlement, to opt out of the Settlement, and to object to incentive awards of $15,000 for each of the three named plaintiffs. *No Class member objected to any aspect of the Settlement, and no Class member opted out of the Settlement Class.* Declaration of Matthew Pohl ("Pohl Decl."), attached as Exh. 9 to Declaration of Jeffrey L. Kodroff ("Kodroff Decl."), at ¶ 11. For that reason and for the reasons set forth below, Plaintiffs respectfully request that the Court grant this motion in its entirety.

PLAINTIFFS' MOTION FOR FINAL                    - 1 -
APPROVAL OF SETTLEMENT

## I.   SUMMARY OF THE CASE

### A.   Plaintiffs' Allegations

Plaintiffs claim that GSK unlawfully excluded competition in the market for Paxil® and its generic equivalents, paroxetine hydrochloride anhydrate and paroxetine hydrochloride hemihydrate. *Class Action Complaint*, ¶ 1. Paxil® is a selective serotonin reuptake inhibitor ("SSRI") anti-depressant drug manufactured by GSK, which has allegedly employed a long-standing scheme to use various illegal and deceptive means to improperly maintain a monopoly with respect to the market for paroxetine hydrochloride. *Id.* The direct purchasers in this action contend that GSK violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in the following unlawful acts, among others: (1) conducting sham litigation against generic manufacturers, which sham litigation triggered a series of events including, or tied to, the automatic thirty-month regulatory stay to generic competition; (2) making intentional misrepresentations to the Patent and Trademark Office; and (3) making intentional misrepresentations to the Food & Drug Administration in order to make fraudulent listings for publication in the Approved Drug Products With Therapeutic Equivalence Evaluations ("Orange Book"), which listings provide Defendant with the ability to wrongfully exclude competition by generic manufacturers. *Id.*

Moreover, Plaintiffs allege that as a result of those illegal acts, GSK has:

- unreasonably restrained, suppressed and eliminated competition in the market for paroxetine hydrochloride (Paxil® and generic versions of Paxil®);

- illegally maintained its monopoly in the market for paroxetine hydrochloride;

- fixed, raised, maintained and/or stabilized the price for Paxil® at supracompetitive levels; and

- overcharged Plaintiffs and other direct purchasers of Paxil® many millions of dollars by depriving them of the benefits of competition from lower-priced generic versions of paroxetine hydrochloride.

*Id.* at 2. As a result of those allegedly illegal acts, which are common to all Plaintiffs and Class members, GSK unlawfully possessed a monopoly in the United States market for paroxetine hydrochloride, and willfully and illegally maintained that monopoly in violation of Section 2 of the Sherman Act. *Id.* at ¶¶ 3-4, 110-120.

A detailed recitation of the background legal and regulatory framework is set forth in paragraphs 15 through 30 of the Kodroff Declaration. In addition, a detailed description of the allegations in the complaint is set forth in paragraphs 31 through 60 of that declaration.

**B.     Pre-Complaint Investigation Conducted by Co-Lead Counsel**

Before filing the complaint, Co-Lead Counsel undertook an intensive investigation of the numerous patents related to Paxil®. Kodroff Decl., ¶ 10. This required a detailed review of all patent filings by GSK related to the molecule paroxetine hydrochloride commonly known as Paxil®, including Patents '723, '423, '132, '759, '944 and '233. Co-Lead Counsel also reviewed fifteen new drug applications (NDAs) filed by GSK with the FDA in support of the various forms of Paxil®. *Id.*, ¶ 11. In addition, Co-Lead Counsel obtained and reviewed the abbreviated new drug applications (ANDAs) filed by each potential generic manufacturer, including Apotex, Geneva, Zenith, Alphapharm, Pentech and Teva – all relating to GSK's patents for Paxil®. *Id.* Co-Lead Counsel also reviewed all of the underlying patent litigations concerning GSK's efforts to prevent any form of generic Paxil® from coming to market. *Id.*, ¶ 13. Co-Lead Counsel worked with experienced patent counsel to determine whether there was a factual basis for filing litigation concerning antitrust violations against GSK concerning Paxil®. *Id.*

**C.     Procedural History**

After the complaint was filed on August 6, 2003, this Court held a status conference on November 18, 2003, at which the Court established an aggressive procedural schedule. Plaintiffs were required to file their motion for class certification by December 12, 2003, complete factual discovery by June 2004, file all dispositive motions by September 2004 and be ready to go into the trial pool in December 2004. In October 2003 GSK answered the complaint, asserting numerous affirmative defenses and denying liability.

Plaintiffs filed their class certification motion on December 10, 2003. With that motion, Plaintiffs submitted the Declaration of Charles King III for the purpose of demonstrating that GSK's prevention of the sale of generic bioequivalents to Paxil®® resulted in common impact to the Class members. Kodroff Decl., ¶ 65. Specifically, Plaintiffs retained Dr. King: (a) to evaluate for the Court whether the alleged antitrust violations and other unlawful conduct by the Defendant had a common impact on the Class of direct purchasers of Paxil®, (b) to identify possible methods for measuring damages on a class-wide basis and (c) to evaluate whether a class-wide analysis is feasible to evaluate impact and damages. *Id.*

In response to the class certification motion, GSK embarked on an aggressive discovery campaign. *Id.*, ¶ 70. It served substantial interrogatories and request for production of documents on the named Plaintiffs. *Id.* While Plaintiffs provided a great deal of information, the parties disagreed over the propriety of the full scope of the discovery. *Id.* As a result, GSK moved to compel Plaintiffs to produce even more documentation. *Id.* Magistrate Judge Smith ruled in GSK's favor. *Id.* Plaintiffs than filed objections to the Magistrate's Order. *Id.* Ultimately, Plaintiffs provided the additional discovery. *Id.*

After completion of the documentary discovery, Plaintiffs identified and produced three corporate designees, one for each named plaintiff, to be deposed. *Id.*, ¶ 71. While this discovery was taking place, GSK also served subpoenas on the big three pharmaceutical wholesalers, AmerisourceBergen Corp. (ABC),  McKesson Corp. (McKesson) and Cardinal Health, Inc. (Cardinal). *Id.*, ¶ 72. This Court permitted GSK to obtain some downstream discovery and stated that, as in *Bradburn Parent/Teacher Store, Inc. v. 3M*, 2004 WL 414047 (E.D. Pa. March 1, 2004), the issue of intra-class conflict between large and small purchasers in an antitrust class action was a serious potential flaw that might negate certification. Kodroff Decl., ¶ 77.

On May 21, 2004, GSK filed its opposition to Plaintiffs' motion for class certification. The opposition relied very heavily on *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (2003) and this Court's decision in *Bradburn*. GSK also relied on an expert report by Peter Greenhalgh to supports its position that issues of liability and damages were completely individual and required denial of the class certification motion. Kodroff Decl., ¶ 78. The parties exchanged detailed expert reports and documentation concerning economic theory and the potential for class certification. *Id.* ¶ 81. Both Plaintiffs' expert, Mr. King, and Defendant's expert, Mr. Greenhalgh, were deposed. *Id.* On June 28, 2004, Plaintiffs filed their Reply Memorandum in Support of Class Certification.

GSK produced hundreds of thousands of pages of documents, both electronically and in hard copy. *Id.*, ¶ 86. Lawyers were assigned to review documents that would be critical to the various issues in this action. *Id.*, ¶ 88. Apart from the document review, counsel were assigned to incorporate all of the relevant information being provided in a detailed annotated chronology that was supplemented through the course of the litigation. *Id.* This detailed chronology allowed Plaintiffs' counsel to correlate all the information obtained from GSK in a single document. *Id.*

**D.     The Settlement Agreement**

The proposed settlement resulted from extensive arm's-length negotiations undertaken in good faith between Plaintiffs' Counsel and GSK. *Id.*, ¶ 90. The settlement negotiation spanned many months. The parties had preliminary discussions in February and March 2004, but these discussions did not lead to a meeting of the minds. *Id.* In fact, at the meeting in February 2004, GSK asked Plaintiffs' counsel to consider voluntarily withdrawing the complaint. *Id.* It was not until June 2004, after Plaintiffs obtained substantial discovery, that a substantive settlement meeting took place. *Id.*

The final process that led to the resolution was the culmination of Co-Lead Counsel's discovery efforts. *Id.*, ¶ 92. Co-Lead Counsel put together a Powerpoint presentation that allowed the parties the ability to scrutinize the strengths and weaknesses of the pending claims, including consideration of liability, causation, and damages, among other issues. *Id.* Plaintiffs' counsel were able to analyze and synthesize hundreds of thousands of pages of documents and data obtained from GSK and various non-parties, including generic manufacturers and large wholesalers. *Id.* At the same time, Plaintiffs answered extensive interrogatories and collected and produced records and documents. *Id.* As a result of this effort, the facts concerning GSK's potential liability were extremely well developed. *Id.* Counsel for the Plaintiffs also retained and worked with experts in evaluating scientific and economic issues relating to liability and damages as well as patent counsel. *Id.* Thus, counsel for the Class were able to make an informed decision regarding the Settlement Agreement. *Id.*

The parties engaged in intensive bargaining over the merits and the value of Plaintiffs' claims, as well as the merits of GSK's defenses. *Id.*, ¶ 92. Because of the extensive arm's-

length bargaining involved, as well as the experience of the counsel involved, there is no issue (or even a suggestion) of any collusive aspect to the proposed settlement. *Id.*

The proposed Settlement Agreement provides for a cash payment of $100 million to the Plaintiffs and the Settlement Class in exchange for a full and complete settlement and release of all claims that the Plaintiffs have asserted or could have asserted in this Class Action. The settlement amount of $100 million excludes claims by eight entities that have excluded themselves from this class action either directly or by assignment, i.e., CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc. Those entities, who are represented individually by separate counsel, have reached a separate settlement with GSK. They have established that they have accounted for slightly more than one-third of the purchases of Paxil® by direct purchasers during the Class period.[1]

**E.      Certification of Settlement Class and Preliminary Approval of Settlement**

In an Order dated November 3, 2004, this Court certified a Settlement Class defined as:

> All persons or entities in the United States or its territories who purchased Paxil® directly from SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline at any time during the period of December 29, 1997 through September 30, 2004. Excluded from the Class are SmithKline, and its employees, subsidiaries and affiliates, and all government entities. Also excluded from the Class are claims held by, either directly or through assignment, CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc.

---

[1] The parties to the Settlement entered into a Supplemental Letter Agreement that would permit GSK to terminate the Settlement if Class Members with an aggregate share of the total class purchases of Paxil® during the Class period exceeding a certain amount (specified in the Supplemental Letter Agreement) excluded themselves from the Class. Settlement Agreement, ¶ 14. No Class Member excluded itself from the Class. Therefore, GSK's rights under the Supplemental Letter Agreement were not triggered.

PLAINTIFFS' MOTION FOR FINAL                    - 7 -
APPROVAL OF SETTLEMENT

In that Order, this Court also granted preliminary approval to the Settlement Agreement entered

into between Plaintiffs, the Settlement Class and Defendant.  In addition, this Court ordered Co-

Lead Class Counsel to give notice to the Settlement Class of the proposed settlement in the form

attached as Exhibits C and D to Plaintiffs' Motion For Certification Of A Settlement Class And

For Preliminary Approval Of Settlement no later than November 15, 2004.  The Court ordered

Co-Lead Class Counsel to mail notice in the form of Exhibit C to each person and entity that

purchased Paxil® directly from GSK at any time during the class period at the last known

address, to publish notice in the form of Exhibit D in *The Pink Sheet*, and to post both forms of

notice on their websites (www.hagens-berman.com and www.srk-law.com) and on a website

especially created for the settlement (www.paxilsettlement.com).  In addition, the Court

approved the Claim Form attached as Exhibit E to Plaintiffs' motion for dissemination to the

Settlement Class.  The Court ordered that a Claim Form be mailed along with the Exhibit C

notice and that it be posted on the three websites listed above.

**F.      Notice, Objections and Opt-Outs**

        Co-Lead Class Counsel complied with the Court's directives concerning Class notice.

Co-Lead Counsel employed Class Action Administration, Inc. ("CAA"), which specializes in the

administration of class actions, to oversee the administration of the Class.  *See* Pohl Decl. (Exh. 9

to Kodroff Decl.), ¶¶ 1-2.  CAA worked with Co-Lead Class Counsel to develop the initial list of

known class members ("Mailing List").  The Mailing List was based on sales information from

GSK and a list of Class members provided by Co-Lead Class Counsel.  *Id.*, ¶ 4.  In order to

reduce confusion on the part of the Class and reduce the likelihood of Class members filing

duplicate claims, CAA attempted to select a single address from the list based on (1) the address

that had the most recent sales activity, or (2) the address that could be identified as being the

PLAINTIFFS' MOTION FOR FINAL                           - 8 -
APPROVAL OF SETTLEMENT

primary address for the organization. *Id.* If a single address could not be identified as being preferred to the other addresses, multiple addresses were added to the Mailing List for that organization. *Id.*

Copies of the Notice and Proof of Claim were mailed to 94 class members on November 15, 2004. *Id.*, ¶ 4. Twenty-two packets were returned. *Id.* If a forwarding address was supplied by the U.S. Postal Service, the packet was remailed to the new address. *Id.* For each returned packet that did not have a forwarding address, CAA conducted an extensive online research to identify a new address. *Id.* Thirteen packets were remailed to new addresses based on the forwarding address or CAA research. *Id.* In most cases where a new address could not be located, CAA was able to verify that the company no longer was in existence (e.g., they were purchased by another class member who had received the packet). *Id.*

CAA developed a web site (www.paxilsettlement.com) dedicated to this settlement. *Id.*, ¶ 5. Co-Lead Class Counsel reviewed and approved the content of the web site, which contains downloadable versions of the Notice, the Proof of Claim form, and the Settlement Agreement, along with information for contacting CAA. *Id.* Notice was also published in the December 2004 volume of *The Pink Sheet*, a publication dedicated to prescription pharmaceuticals and biotechnology. *Id.*, ¶ 6. In addition, CAA established a toll free number dedicated to this project which class members could use to inquire about the settlement. *Id.*, ¶ 7.

As of January 6, 2005, CAA received 34 completed claim forms. *Id.*, ¶ 8. All claims were postmarked prior to the December 31, 2004, deadline established by the Court. *Id.* CAA is still in the process of evaluating the validity of the claims received. *Id.* CAA received three claims from claimants that are not class members, because they are not direct purchasers of Paxil®. *Id.*, ¶ 9. CAA contacted those claimants to let them know they had submitted a claim

PLAINTIFFS' MOTION FOR FINAL                    - 9 -
APPROVAL OF SETTLEMENT

with the wrong administrator. *Id.* CAA also forwarded a copy of these claims to the class

administrator handling the indirect purchaser settlement. *Id.* CAA will recommend that these

claims be denied in this action. *Id.* As of January 6, 2005, CAA has not received a single

objection to the settlement, nor has CAA received a single opt out from the Class. *Id.*, ¶ 11.

## II.    THE SETTLEMENT SHOULD BE APPROVED

### A.    Standards For Approving Class Settlement

Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure states that the "court must

approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of

a certified class." Rule 23(e)(2) states: "The parties seeking approval of a settlement, voluntary

dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement

made in connection with the proposed settlement, voluntary dismissal, or compromise." The

only agreement reached by the parties relating to the settlement of this action is the Settlement

Agreement itself.

The Third Circuit has identified "nine factors to be considered when determining whether

a proposed class action settlement is fair, reasonable and adequate." *In re Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004). Those factors are:

> (1) The complexity, expense, and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Id.* at 534-535.

**B.    The Settlement Merits Approval**

Under the standards established by Rule 23 and the factors identified by the Third

Circuit, the Settlement Agreement should be approved.

### 1.    Complexity, Expense, and Likely Duration of Litigation

This factor "captures the probable costs, in both time and money, of continued litigation."

*Cendant*, 264 F.3d at 233 (citation omitted).  In *Warfarin*, the Court stated:

> We agree with the District Court's conclusion that this factor
> favors settlement because continuing litigation through trial would
> have required additional discovery, extensive pretrial motions
> addressing complex factual and legal questions, and ultimately a
> complicated, lengthy trial.  Moreover, it was inevitable that post-
> trial motions and appeals would not only further prolong the
> litigation but also reduce the value of any recovery to the class.  In
> a class action of this magnitude, which seeks to provide recovery
> for Coumadin consumers and TPPs nationwide, the time and
> expense leading up to trial would have been significant.

391 F.3d at 536.  Similarly, settlement in this case eliminates the financial burden that would be

involved in litigating this case to trial.  This case concerns 15 underlying actions filed by GSK in

the Eastern District of Pennsylvania against generic manufacturers Geneva, Apotex, Zenith,

Alphapharm, Andrx and Teva and three other underlying cases filed by GSK in the Northern

District of Illinois – one against Apotex and two against Pentech.  Kodroff Decl., ¶ 13; Exh. 4

thereto.  The parties would have to bear the costs of multiple experts – such as economists,

patent experts, organic chemists, and FDA experts – throughout discovery and trial to address the

myriad of legal and scientific questions addressed in those cases, as well as to address the issues

of sham litigation.  A cost-benefit analysis comparing the resources that would be spent bringing

this case to trial with the certainty provided by a substantial settlement weighs heavily in favor of

approving the Settlement.

## 2.    The Reaction of the Class to the Settlement

In *Warfarin*, the Third Circuit stated: "Although we have previously noted that the district court should be 'cautious about inferring support from a small number of objectors in a sophisticated settlement,' *General Motors*, 55 F.3d at 812 (citations omitted), we agree with the District Court that the small number of TPP objectors is particularly telling as they are sophisticated businesses with very large potential claims." 391 F.3d at 536.  Similarly, all of the Class members in this litigation are sophisticated businesses with very large potential claims, but none of them has objected to the Settlement Agreement or opted out of the Class.  Pohl Decl., ¶ 11.

## 3.    Stage of Proceedings and Amount of Discovery Completed

This third factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235 (*quoting General Motors*, 55 F.3d at 813).  As detailed in Section I of this memorandum, Plaintiffs' counsel conducted an extensive investigation before filing the complaint, engaged in far-reaching discovery during the course of this action (including expert depositions, third party discovery and the review of hundreds of thousands of pages of GSK documents), briefed class certification, deposed GSK's class certification expert, and thoroughly prepared for the scheduled December 2003 trial.  This factor, therefore, weighs heavily in favor of approving the Settlement Agreement.

## 4.    Risks of Establishing Liability

The settlement eliminates the risks involved in litigating this complex matter.  GSK's attorneys have demonstrated that they will zealously present a strong case.  Therefore, there is a

PLAINTIFFS' MOTION FOR FINAL                        - 12 -
APPROVAL OF SETTLEMENT

substantial risk that Plaintiffs would not prevail in this action, which supports settlement. *See, e.g., In re First Databank Antitrust Litig.,* 205 F.R.D. 408, 411 (D.D.C. 2002) (noting inherent uncertainty of antitrust litigation in preliminarily approving settlement).  Unlike many civil antitrust cases, here there has been no prior determination of criminal or civil liability.  To recover at trial, Plaintiffs will have to prove that GSK knowingly and fraudulently pursued patents on Paxil®, enforced or sought to enforce those patents knowing that they were obtained by fraud and that GSK's actions artificially raised the price of Paxil®, all against a vigorous and well-funded defense.

Plaintiffs and Co-Lead Class Counsel recognize that there are extreme risks in taking this case to trial.  This case is based on more than 20 underlying patent infringement suits that GSK brought against more than nine generic manufacturers, each alleging infringement of one of more of GSK's numerous paroxetine patents.  The primary Paxil® patent at issue is the '723 patent. Plaintiffs allege that GSK waged sham patent infringement litigation over the '723 patent and that the '723 patent was procured by Beecham by fraud on the United States Patent and Trademark Office ("PTO").

Plaintiffs' claim of sham litigation faces potentially insurmountable barriers.  As the Federal Circuit has explained, "in order to prove that a suit was within *Noerr*'s 'sham' exception to immunity, an antitrust plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068, 1072 (Fed. Cir. 1998). *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993).  Rulings by district court judges in the litigation over the '723 patent make it extremely difficult for Plaintiffs to meet their burden of proof.  After a full

PLAINTIFFS' MOTION FOR FINAL            - 13 -
APPROVAL OF SETTLEMENT

trial on the merits between GSK and Apotex, Judge Posner ultimately ruled that GSK's '723

patent was not infringed. *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011

(N.D. Ill. 2003), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004).  However, Judge Posner later specifically

ruled in another lawsuit that GSK's litigation conduct against Apotex concerning the '723 patent

did not constitute sham litigation because GSK's position was not objectively baseless.  In

assessing a sham litigation claim, Judge Posner stated that the plaintiff "cannot pass an objective

test. Although I did rule that Apotex had not infringed patent 723, I made clear that the issue was

a close one." *Asahi Glass Co. v. Pentech Pharm., Inc.*, 2003 U.S. Dist. LEXIS 19370, *18 (N.D.

Ill. Oct. 30, 2003).

Plaintiffs also must overcome Judge Kocoras's order (entered before Judge Posner was

assigned the case for trial) granting GSK's motion for summary judgment on the issue of

invalidity of the '723 patent under 35 U.S.C. § 102(b), (f), and (g).  *SmithKline Beecham v.

Apotex*, 286 F. Supp. 2d 925 (N.D. Ill. 2001).  Judge Kocoras found that there was no public use

of Paxil® prior to issuing of the patent. He reasoned that clinical trials for hemihydrate

constituted experimental use and thus negated public use.  Given Judge Kocoras's ruling in favor

of GSK, Plaintiffs will have a difficult time establishing that GSK's position on that issue was

objectively baseless.  Thus, while the Federal Circuit ultimately ruled that the public use bar of

35 U.S.C. § 102(b) rendered claim 1 of the '723 patent invalid, there are extremely high barriers

that Plaintiffs must surmount to demonstrate that GSK's litigation regarding the '723 patent was

sham.

Plaintiffs' claim for fraud on the PTO faces similar problems.  The Federal Circuit has

explained that antitrust liability may be imposed if it can be shown that "the asserted patent was

obtained through knowing and willful fraud." *Nobelpharma*, 141 F.3d at 1068.  Thus, Plaintiffs

must show intentional misrepresentation or omission of a material fact that was reasonably relied upon by the PTO. Plaintiffs allege that GSK defrauded the PTO by, among other things, failing to disclose public use of paroxetine hydrochloride in Clinical Trials in the United States. Plaintiffs claim that GSK knew that clinical trials did not distinguish between anhydrate and hemihydrate forms of Paxil® and yet obtained further patents for Paxil®. While Plaintiffs have evidence to support the claim that the '723 patent was procured by fraud, there are still significant challenges in defending that claim, given the high standard of proof that they face. As the Federal Circuit has explained, "a finding of *Walker Process* fraud may not be based upon an equitable balancing of lesser degrees of materiality and intent. Rather, it must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission." *Id.* at 1071. Thus, there is a great risk that Plaintiffs and the Class will recover nothing if this case proceeds.[2]

### 5.    Risks of Establishing Damages

In approving a class settlement in another lawsuit, this Court stated that "Plaintiffs' damages theories rested primarily on the testimony and reports of expert witnesses. Such experts would likely have been challenged on *Daubert* or other grounds. Plaintiffs, therefore, risked the rejection of its experts first by the Court pursuant to Federal Rule of Evidence 104(a), or by the jury in assessing credibility." *In re Aetna Inc. Sec. Litig.*, 2001 U.S. Dist. Lexis 68, *33 (E.D. Pa. Jan. 4, 2001). In that case, this Court also stated: "In light of the wide disparity in damage assessments, Plaintiffs risked the rejection of their expert damages witness by the jury, while Defendants risked entry of a massive damage award against them. The settlement avoids this

---

[2] Moreover, there are substantial questions as to whether and when generic products would have entered the marketplace but for GSK's allegedly wrongful conduct. If generics could not have entered the marketplace in any event, Plaintiffs and the Class would not have suffered damages.

uncertainty for both sides." *Id.* Similarly, the Settlement Agreement in this action would avoid

uncertainty for both sides regarding damages.

### 6.    Risks of Maintaining Class Action Status Through Trial

Plaintiffs and the Settlement Class face the risk that the Court would not certify a class

for trial purposes. In certifying the Settlement Class, this Court did not have to decide whether

the class would be manageable for trial purposes. *See Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district

court need not inquire whether the case, if tried, would present intractable management

problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

While Plaintiffs believe that a class action would not present intractable management problems

in this action, there is always the risk that the Court would decline to certify a class for trial

purposes. In *Warfarin*, the Third Circuit stated:

> A district court retains the authority to decertify or modify a class
> at any time during the litigation if it proves to be unmanageable.
> *Prudential*, 148 F.3d at 321. Although Appellants' concerns about
> the manageability of a multistate class of consumers and TPPs, as
> we discussed above, did not pose a problem for the certification of
> a settlement class, there is a significant risk that such a class would
> create intractable management problems if it were to become a
> litigation class, and therefore be decertified. *See In re LifeUSA
> Holding, Inc.*, 242 F.3d at 147; *Georgine*, 83 F.3d at 630. We
> agree with the District Court that the significant risk that the class
> would be decertified if litigation proceeded weighs in favor of
> settlement.

391 F.3d at 537. Similarly, because there is a risk that a class in this action would not be

certified for trial purposes, this factor weighs in favor of settlement.

7.      **Ability of Defendant to Withstand Greater Judgment**

This factor neither favors nor disfavors approval of the Settlement Agreement. In

*Warfarin*, the Third Circuit stated:

> Although the plaintiffs do not dispute that DuPont's total resources
> far exceed the settlement amount, the fact that DuPont could afford
> to pay more does not mean that it is obligated to pay any more than
> what the consumer and TPP class members are entitled to under
> the theories of liability that existed at the time the settlement was
> reached. Here, the District Court concluded that DuPont's ability
> to pay a higher amount was irrelevant to determining the fairness
> of the settlement. We see no error here.

319 F.3d at 538. Similarly, Defendant in this action would be able to fund a larger settlement,

but that is irrelevant to determining the fairness of the Settlement Agreement.

8.      **Reasonableness of Settlement In Light of Best Possible Recovery And In
        Light of Risks of Litigation**

Under the eighth and ninth factors, "the evaluating court must recognize that settlement

represents a compromise in which the highest hopes for recovery are yielded in exchange for

certainty and resolution and guard against demanding too large a settlement based on the court's

view of the merits of the litigation." *In re Aetna Inc. Sec. Litig.*, 2001 U.S. Dist. Lexis 68, *34-

35 (E.D. Pa. Jan. 4, 2001). As explained in Plaintiffs' motion for preliminary approval,

Plaintiffs' expert estimates that damages for ***all*** direct purchasers, including the eight opt-out

entities, would total approximately $1.78 billion, assuming generic entry in early 2001. (GSK

disputes that generic entry would have occurred at that time and contends that it would have

occurred much later.) That damage figure does not account for the phenomenon of generic

bypass, which could reduce the damage figure by twenty percent or more. Assuming the

reduction is twenty percent, potential best-case damages would be reduced to approximately $1.4

billion. Further, the eight opt-out entities account for slightly more than one-third of all

purchases, so that the damage figure for the Settlement Class would equal approximately $880

million. Thus, the settlement of $100 million is approximately 11.4% of potential damages. As

Judge DuBois recently noted, courts have granted final approval to many settlements in the range

of ten percent of potential damages where substantial risks exist. *See In re Linerboard Antitrust*

*Litig.*, 2004 U.S. Dist. LEXIS 10532, *15-17 (E.D. Pa. June 2, 2004).[3] Similarly, in *Warfarin*,

the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to

14%." 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241).

Given all the foregoing factors, the Settlement Agreement should be approved. In *Aetna*,

this Court stated:

> Considering the present value of money, the difficulties Plaintiffs
> would likely face in proving liability, the likelihood that the
> damages received would have been lower than Plaintiffs'
> maximum estimate, and the aggressive opposition to both liability
> and damages mounted by Defendants, the Court determines that
> this settlement falls within a reasonable range. Taking Plaintiffs'
> maximum estimate of recovery at trial if all issues were resolved in
> their favor, the gross settlement provides a recovery of
> approximately ten percent of the best possible recovery. This
> percentage is consistent with those approved in other securities
> fraud cases. *See In re Ikon*, 194 F.R.D. at 183. Furthermore,
> Defendants argued that the provable losses were substantially
> lower. Plaintiffs' experts calculated damages to be $830 million,
> while Defendants' experts asserted that Plaintiffs lost at most $117

---

[3] The Court cited the following cases: "*Lazy Oil Co v. Witco*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (court approved settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the of the damages falling within the limitations period); *In re Anthracite Coal Antitrust Litigation*, 79 F.R.D. 707, 714 (M.D. Pa. 1978) (approving settlement of 28 percent of estimated damages for four years); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) (court approved a combined settlement of approximately 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94-404 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); *Fox v. Integra Financial Corp.*, Civil Action No. 90-1504 (W.D. Pa. July 9, 1996) (settlement of $6.5 million approved where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.*, 58 F.R.D. 19, 36-37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB*, Fed. Sec. L. Rep. (CCH) P 95,324 at 96,559, 1990 WL 73423 at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens v. Wotemco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise."), *aff'd* 899 F.2d 21 (11th Cir. 1990)." *Linerboard*, 2004 U.S. Dist. LEXIS 10532, at *15-17.

> million. The gross settlement provides the recovery of seventy
> percent of the losses estimated by Defendants. Additionally, the
> "hallmarks of a questionable settlement" are absent. Plaintiffs will
> receive a significant monetary settlement, and there is no
> suggestion of collusion between Defendants and Plaintiffs'
> counsel.

2001 U.S. Dist. Lexis 68, at *35. For similar reasons, the Settlement in this action merits

approval.

## III.   PLAINTIFFS SHOULD BE GRANTED INCENTIVE AWARDS

Plaintiffs request that the Court award each of them $15,000 for their efforts in

prosecuting this litigation on behalf of the class. *See In re Lorazepam & Clorazepate Antitrust*

*Litig.*, 205 F.R.D. 364, 400 (D.D.C. 2001) ("courts routinely approve incentive awards to

compensate named plaintiffs for the services they provided and the risks they incurred during the

course of the class action litigation.") (citations and internal quotations marks omitted). In

*Godshall v. Franklin Mint Co.*, 2004 U.S. Dist. Lexis 23976 (E.D. Pa. Dec. 1, 2004), the Court

granted incentive awards of $20,000 to each of two plaintiffs where the gross class settlement

was only $1.125 million. The Court stated: "The requested award would reduce the payment to

other class members by approximately 5%. The class members were notified of this

proposed special payment, and voiced no objections. These two individuals' efforts have

conferred benefits on all class members, and they should earn special compensation for this

work. The Court finds the proposed awards to the named plaintiffs are reasonable given their

efforts in bringing this action and the benefits they conferred to the class." *Id.* at *20-21

(footnote omitted). In another case in this district, the Court awarded $25,000 to each of five

plaintiffs. The Court stated:

> [T]he Court notes that the amount requested, $25,000, is
> comparable to incentive awards granted by courts in this district

and in other circuits. *See, e.g., In re Graphite Electrodes Antitrust Litigation*, MDL No. 1244 (E.D.Pa. Order of September 8, 2003) ($80,000); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa. 1985) ($20,000); *In First Jersey Securities, Inc.*, MDL No. 681 (E.D. Pa. 1989) ($24,000); *In re Revco Securities Litigation*, Nos. 851 & 89 CV 593, 1992 WL 118800 (N.D. Ohio May 6, 1992) ($90,000); *In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y. Order of April 7, 2003) ($25,000); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907 (S.D. Ohio 2001) ($50,000); *In re Cardizem CD Antitrust Litigation*, MDL No. 1278 (S.D. Mich., Order of Nov. 26, 2002) ($20,000).

*In re Linerboard*, 2004 U.S. Dist. Lexis 10532, at *57-58.

Of crucial importance is the willingness of the three Plaintiffs to bring this action in the first place. The plaintiffs' antitrust class action bar and large corporate entities that were direct purchasers from GSK perceived this litigation to present such great risk that, unlike most antitrust class action cases, only one case was filed. Kodroff Decl., ¶ 4. After the filing of an antitrust class action it is common for there to be many "copycat" or "tag along" actions filed immediately after the initial suit. *Id.* In this litigation only one action was filed, and no other client or firm elected to file and participate in this litigation. *Id.* The absence of other suits was very unusual and required particular commitment by the companies and law firms that had undertaken to bring suit. *Id.*

Moreover, each of the named plaintiffs assisted Co-Lead Class Counsel by answering interrogatories, producing voluminous documents and appearing for depositions. Further, an award of $15,000 to each of the three named plaintiffs would constitute less than one-half of one percent of the gross settlement of $100 million. Finally, no Class member objected to the requested incentive awards even though the notice informed them that "Class Counsel will also ask the Court for an incentive award in the amount of $15,000 for each of the three Class Representatives who prosecuted this case on behalf of the entire Class." Therefore, the three

named plaintiffs should be awarded $15,000 each in addition to their pro rata share of the net settlement fund.

## IV.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

Plaintiffs propose to allocate the net settlement funds on a pro rata basis. All fees, costs, and incentive awards approved by the Court will be deducted from the gross settlement of $100 million. The net settlement fund will then be distributed on a pro rata basis to all Class members that file timely claim forms based on purchases made during the class period. The administrator will determine the total purchases of Paxil® during the Class period by all Class members who submit timely claim forms and will then determine each such Class member's proportionate share of Paxil® purchases during that time period. The administrator will then determine each such Class member's proportionate share of the net settlement fund.

The plan of allocation should be approved. In *Aetna*, 2001 U.S. Dist. Lexis 68, at *36, this Court stated:

> In addition to examining the general settlement terms, the Court must further determine the reasonableness of the plan of allocation. See *In re Ikon*, 194 F.R.D. at 184. "Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" *In re Ikon*, 194 F.R.D. at 194 (*quoting In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 321 (D. N.J. 1998)). Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.

The plan of allocation treats all purchases throughout the Class period equally, which means that all purchasers are treated equally and that the plan is fair, reasonable and adequate.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court (1) grant final approval to the Settlement

Agreement, (2) approve the plan of allocation, and (3) award each Plaintiff $15,000 in addition

to its pro rata share of the net settlement fund.

**THE STOP & SHOP SUPERMARKET
COMPANY, GIANT OF MARYLAND,
LLC, and AMERICAN SALES CO., INC.**

Dated:  January 10, 2005

By Their Attorneys,

Jeffrey L. Kodroff
David Felderman
Rachel E. Kopp
SPECTOR ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Phone:    (215) 496-0300
Fax:        (215) 496-6611

Thomas M. Sobol
HAGENS BERMAN LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Phone:    (617) 482-3700
Fax:        (617) 482-3003

Steve W. Berman
Craig R. Spiegel
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Phone:    (206) 623-7292
Fax:        (206) 623-0594